1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

3   GENESIS ALKALI WYOMING, LP,     :
                                     :
4                   Plaintiff,       :
                                     :
5            vs.                     : Civil Action No.
                                     : 18-1879-LPS-JLH
6   CINER RESOURCES LP, et al.,      :
                                     :
7                   Defendants.      :

8                    - - -

9                    Courtroom No. 6C
                     J. Caleb Boggs Federal Building
10                   844 North King Street
                     Wilmington, Delaware
11                   Monday, October 5, 2020
                     1:02 p.m.
12
                     - - -
13
    BEFORE:  HON. JENNIFER L. HALL, Magistrate Judge.
14

15                   - - -

16    CLAIM CONSTRUCTION HEARING AND RULING OF THE COURT

17

18

19

20

21

22

23
    _____
            LORRAINE B. MARINO, RDR, CRR
24               11 Durboraw Road
           Wilmington, Delaware 19810
25                (302) 475-4935

2

```
 1    APPEARANCES:(via videoconference)

 2                    MICHAEL J. FARNAN, ESQ.
                      Farnan LLP
 3                      919 North Market Street - 12th Floor
                        Wilmington, DE  19801
 4                      302-777-0300
                        mfarnan@farnanlaw.com
 5                            -and-
                      MARTIN BLACK, ESQ. ESQ.
 6                    JOSEPH GRIBBIN, ESQ.
                      VI TRAN, ESQ.
 7                    Dechert LLP
                        Cira Center
 8                      2929 Arch Street
                        Philadelphia, PA  19104
 9                      215-994-2000
                        martin.black@dechert.com
10                      joseph.gribbin@dechert.com
                        vi.tran@dechert.com
11                      for Plaintiff

12                    ALAN R. SILVERSTEIN, ESQ.
                      Potter Anderson & Corroon LLP
13                      Hercules Plaza - Sixth Floor
                        1313 North Market Street
14                      Wilmington, DE  19801
                        302-984-6000
15                      asilverstein@potteranderson.com
                              -and-
16                    JEFFREY S. GINSBERG, ESQ.
                      JOSHUA R. STEIN, ESQ.
17                    MATTHEW B. WEISS, ESQ.
                      EMMA ELLMAN-GOLAN, ESQ.
18                    Patterson Belknap Webb & Tyler LLP
                        1133 Avenue of the Americas
19                      New York, NY  10036
                        212-336-2000
20                      jginsberg@pbwt.com
                        jstein@pbwt.com
21                      mweiss@pbwt.com
                        eellmangolan@pbwt.com
22                      for Defendants

23                              - - -

24

25
```

LORRAINE B. MARINO, RDR, CRR

3

1           THE COURT:  Good afternoon, everyone.

2    Can you hear me?

3           MR. BLACK:  Yes, we can.

4           MR. GINSBERG:  Good afternoon, Your

5    Honor.

6           THE COURT:  We are here today for a

7    Markman hearing in Genesis Alkali Wyoming, LP vs.

8    Ciner Resources, LP.  It is Case No. 18-1879-LPS-JLH.

9    Let's have appearances for the record, starting with

10   Delaware counsel for plaintiff.

11          MR. FARNAN:  Good afternoon, Your

12   Honor.  It is Michael Farnan, and with me on the line

13   are Marty Black, Joe Gribbin and Vi Tran, from

14   Dechert.  And also we have Katherine Tweel, who is the

15   general counsel from Genesis.

16          THE COURT:  Good afternoon to all of

17   you.

18          MR. BLACK:  Good afternoon.

19          MR. GRIBBIN:  Good afternoon, Your

20   Honor.

21          THE COURT:  And let's have appearances

22   for defendant, starting with Delaware counsel.

23          MR. SILVERSTEIN:  Good afternoon, Your

24   Honor.  Alan Silverstein, from Potter, Anderson.  With

25   me on the line today are Jeffrey Ginsberg, Joshua

4

1    Stein, Matthew Weiss, and Emma Ellman-Golan, from the

2    Patterson firm.  Also on the line with me today is

3    Marla Nicholson, for Ciner Resources.

4                    THE COURT:  Good afternoon to all of

5    you.

6                    MR. GINSBERG:  Good afternoon, Your

7    Honor.

8                    THE COURT:  So I will say for the

9    record that we are proceeding via video conference

10   today because we are in the midst of a global pandemic

11   caused by the COVID-19 virus.  I am currently at the

12   courthouse.  However, my staff, including my courtroom

13   deputy, are working remotely.  The court reporter

14   today is Lorraine Marino.  She is on the video

15   conference as well working remotely.

16                   We have stopped submission of paper

17   copies to the Court due to the pandemic, so I have

18   some exhibits in electronic form on my computer and I

19   have some printed out.  I also have copies of each

20   side's slide presentation that was submitted directly

21   to Chambers, which I can view on my computer as well.

22   And I will be taking notes on my computer while a

23   separate webcam is capturing my audio and video.

24                   And I say all of this to let you know

25   that while I may not be looking directly at the camera

1    during the hearing, I am listening and following

2    along.  I have multiple screens in front of me.

3                    It is possible that I may turn my

4    camera off while the parties are making their

5    presentations, but that does not mean I have

6    disconnected.  If I do happen to disconnect, I will

7    let my courtroom deputy know so that she can alert the

8    parties in conference.

9                    I understand that some of the filings

10   we will be discussing today are under seal.  I did not

11   get any requests to seal the courtroom, and as you all

12   know, there is a public right of access to judicial

13   proceedings.  So if there are particular slides that

14   you want me to review that should remain under seal,

15   you can direct me to a particular slide in your

16   presentation or a particular document in the record

17   before me and just not put it up on the presentation

18   screen.  But I was not planning on sealing any of

19   these proceedings.  Okay?

20                   I am not sure if the parties have an

21   understanding as to how they wanted to proceed.  I

22   understand that we have given each side a total of 90

23   minutes for argument, and I don't know if you all had

24   discussed proceeding term by term or if you wanted to

25   complete your presentation and then switch to the

1    other side.

2                  MR. BLACK:  This is Martin Black, Your

3    Honor.  I think it would be more efficient to go term

4    by term.  And I think that we are happy to announce

5    that one of the terms was agreed to this morning, the

6    recovered mine brine, so we have four terms to argue:

7    The steps, evaporation-stripping, concentrated brine,

8    and first mother liquor.

9                  And we are going to suggest that since

10   we are the plaintiff, we go ahead on the first three,

11   and since the fourth one, first mother liquor, is an

12   indefiniteness argument, that the defendant should

13   take the first stab at that one.

14                  THE COURT:  Okay.  That's fine.  Is

15   that okay with counsel for defendant?

16                  MR. GINSBERG:  Yes, Your Honor.  This

17   is Jeff Ginsberg, of Patterson Belknap.  That order is

18   fine.  And just one point that I did raise with

19   Mr. Black earlier this morning.  We do feel that the

20   mother liquor term is tied to the order of steps, so

21   when we get to the end of the order of steps, if Your

22   Honor would prefer, we can proceed with mother liquor

23   and we can complete those two terms, and then

24   proceeding with the final two terms.

25                  THE COURT:  I actually would prefer to

1    do it that way, since having read the briefs

2    carefully, I do think that they are intertwined.  So

3    let's proceed in that fashion.  And we will start

4    first with Mr. Black.

5                    MR. BLACK:  Thank you, Your Honor.  I

6    am going to handle three of the terms and Mr. Gribbin

7    will handle the concentrated brine and crystallizable

8    solutions.

9                    THE COURT:  Very good.  And can you

10   just say one more time as I am following along which

11   was the term that was resolved?

12                   MR. BLACK:  The recovered mine brine.

13   My understanding is that Ciner has agreed to our

14   construction.  But Mr. Ginsberg should speak for

15   Ciner, not me, so --

16                   MR. GINSBERG:  That is correct, Your

17   Honor.  We have agreed to apply the plain and ordinary

18   meaning to the term "recovered mine brine."

19                   THE COURT:  Very good.  All right.

20   Please proceed.

21                   MR. BLACK:  Thank you, Your Honor.

22                   I am going to begin by talking about

23   the order of steps and really briefly overview the

24   claim.  I won't go into the technical details or a

25   tutorial.  I think the briefs have pretty well set out

1    how the technology works, and I think it would be best

2    to address any specific issues as they come up.

3                    The order-of-steps issue is really a

4    bit of a misnomer.  During the original claim

5    construction back and forth, the meet-and-confer,

6    Ciner asked for a construction that all steps have to

7    be performed in order.  That's not really what the

8    issue is about, though.  As we went through the

9    briefing, it is fairly clear that the issue is what is

10   the mother liquor that is input into element 1(e).  Is

11   it 1(c) mother liquor?  Can it come from 1(d), or

12   both?

13                   We don't contest that the parts of the

14   claim that have antecedent basis in earlier steps

15   refer to the output of an earlier step.  The real

16   issue, it is not an order-of-steps issue at all.  It

17   is just a question of fair claim construction.

18                   So I am going to try to put up my

19   slides here.  See if this works.  Can everybody see

20   that?

21                   THE COURT:  Yes.

22                   MR. BLACK:  Okay.  So there are seven

23   elements to the claim.  There are three that are

24   specifically called out as steps:  The evaporation-

25   stripping step, a monohydrate crystallization step,

**9**

1    and a decahydrate crystallization step.  The other

2    elements are mixed in.  Some of them are included

3    within these steps.  Some of them are ancillary to

4    them.  But the principal question at issue here is

5    whether Ciner's construction that all must be

6    performed sequentially should be adopted.  We object

7    to that.  We don't actually think you need to give an

8    instruction with respect to that they don't need to be

9    performed sequentially.  We just object to the

10   sequential requirement that Ciner has proposed because

11   it is not an accurate description of the claims.  If

12   you do want to argue for a construction that all

13   elements, all steps must be performed in order, the

14   law is fairly clear that the burden is on the party

15   seeking that construction.

16                 Just a short slide here to show in

17   some inventions, some recipes, some steps are required

18   to be done in order.  Here you can add any of the

19   first three ingredients in any order you want, but

20   then you need to mix and bake in the right order.  If

21   you bake the butter first, you are going to have a

22   problem.  But it all comes down to what are the actual

23   words of the claim, just like in any other claim

24   construction issue.

25                 Now, here, we have element 1(c).

1    There is a monohydrate crystallization step, which

2    occurs in a crystallizer.  The crystallizer forms a

3    slurry of sodium carbonate monohydrate crystals and a

4    first mother liquor.  And a mother liquor -- and we

5    have some definitions that we refer to in the brief --

6    is simply the solution that is left over after the

7    crystals precipitate out.  Now, the solution can have

8    crystals in it, it can have a slurry in it, and it

9    might need to be isolated to be further used.  But as

10   the patent describes, it can also be in a pure form

11   inside the crystallizer behind the baffle.

12                But most importantly for purposes of

13   this claim construction dispute, the mother liquor in

14   element 1(c) that is formed during the crystallization

15   process in the monohydrate crystallizer is "suitable

16   as feed to a sodium carbonate decahydrate

17   crystallization step."  So the claim is explicit.  The

18   mother liquor formed in 1(c) is suitable to be fed to

19   the deca step.

20                Now, we have the deca step described

21   in 1(e), which talks about feeding at least a portion

22   of the first mother liquor to the deca step.  1(c),

23   you need to form a mother liquor that is suitable for

24   feed to the deca step.  1(e), we feed the mother

25   liquor to the deca step.

1        So whatever the construction is going

2   to be, it cannot be a construction which prohibits

3   feeding mother liquor formed in the crystallizer,

4   monohydrate crystallizer, into the deca step.  That is

5   not a possible construction here on this language,

6   putting aside who has the burden, as they do.

7        We are not sure entirely what they

8   plan to argue when we get to non-infringement because

9   we believe we have an infringement case regardless of

10  the constructions.  But it appears that what they are

11  trying to argue is that element 1(d), which discusses

12  a process for drying, for separating crystals from the

13  mother liquor in the final, to make the end product,

14  that we have to perform that process and can only use

15  mother liquor isolated in that process to feed it into

16  1(e).  Certainly we would hear that argument in

17  closing if the construction they have proposed is

18  adopted, and we think that that would shift the

19  meaning of the claim, make it more difficult, but not

20  impossible, to prove infringement in this case, and

21  that would be unfair.  We can't have a construction

22  that allows the jury or allows them to argue that you

23  can't feed suitable for feed to decahydrate

24  crystallization step mother liquor to the deca step.

25  So that's the principal argument.

1          So the nub of the dispute is not

2    really an order-of-steps issue but whether or not you

3    can preclude the use of the suitable for deca feed to

4    the deca step.  That's how we see the issue, Your

5    Honor.

6          Now, there is another related issue,

7    and I will address this more fully after we hear the

8    indefiniteness point.  But there are different places

9    where the mother liquor appears.  It is created in the

10   crystallizer during the crystallization process, but

11   then it is sent to various parts of the system.  It

12   goes to -- it can be sent to the decahydrate

13   crystallizer.  It can be sent back -- it can be

14   recycled back to the monocrystallizer.  It can be sent

15   to be separated out in the sludge.  There are lots of

16   places where that solution, the first monohydrate,

17   first mother liquor can be used in the system, but

18   that's not relevant to this issue of the order of the

19   steps.

20          The first mother liquor in the mono

21   crystallizer, a second mother liquor in the deca

22   crystallizer, and those solutions are recycled, and

23   sometimes one is fed into the other crystallizer.

24   There are many different examples given in the claims

25   of how to do that.

1          So those are the main points, Your

2   Honor.  I'm sure I will have more to say after we hear

3   from Mr. Ginsberg on this and on the indefiniteness

4   issue.

5               THE COURT:  Are you arguing,

6   Mr. Black -- and I don't think you are, but I want to

7   make sure.  You are not arguing that the slurry that

8   is formed in step (c) conclude can be fed to the deca

9   crystallizer.

10              MR. BLACK:  No, Your Honor.  You need

11  a solution.  You need a mother liquor that has been

12  isolated, which happens --

13              THE COURT:  But isolated means

14  separated; right?

15              MR. BLACK:  Yes, separated, yes, Your

16  Honor.  The mother liquor is the solution, but the

17  mother liquor can be combined with crystals, the

18  sludge at the bottom, and be drawn off and separated,

19  and then it can be used for multiple purposes.  The

20  mother liquor can also be found in the crystallizer

21  itself, in certain areas of the crystallizer, like

22  behind the baffle, and that mother liquor is the same

23  mother liquor as in the separator.  It is just a

24  different portion of it.

25              THE COURT:  And just to clarify a

1   point, you are not arguing that you can take this --

2   again, you are not arguing you can take a slurry and

3   feed it into the deca crystallizer.  You are arguing

4   that you will still separate the first mother liquor

5   and then feed it to the deca crystallizer, and then

6   even if I go with their claim construction, that your

7   separation will meet step (d) because step (d) doesn't

8   require, for example, a centrifuge.

9               MR. BLACK:  Right, Your Honor.  What

10  we are being cautious about is if the mother liquor is

11  taken from the quiescent zone in the crystallizer and

12  sent to the deca crystallizer, that would constitute

13  infringement, in our view.  And what they are going to

14  argue with the order-of-steps argument, if they get

15  it, is that, no, that's prohibited; that you have to

16  go through this separate step in 1(d), and that's just

17  not required by the claim language.

18              THE COURT:  Okay.  I don't have any

19  more questions about that term.

20              Counsel, it is possible you are on

21  mute.

22              MR. GINSBERG:  Sorry about that, Your

23  Honor.

24              THE COURT:  Don't worry.  It only

25  happens like 95 percent of the time.

1              MR. GINSBERG:  I understand.  I have

2  never done that before.

3              So I think, Your Honor, you hit the

4  nail on the head.  And I think from what I am hearing

5  from Mr. Black, he is conceding that there needs to be

6  some separating step between the monohydrate

7  crystallizing step and the decahydrate crystallizing

8  step.  Ciner's construction is not seeking a

9  requirement that there be the centrifuge.  There does

10 need to be a separating step, and that's the crux of

11 the issue.  If you read the entirety of the

12 specification and the claims, it is clear that there

13 needs to be a separating step between the monohydrate

14 crystallization step and the decahydrate crystallizer,

15 crystallizing step.  And it appears Mr. Black conceded

16 that point, but again, I might have misheard.  But

17 that, Your Honor, I think, hit the nail on the head.

18              And I will go through our slides, but

19 unless Your Honor has a question on that point, as

20 Your Honor has seen from our presentation, we did

21 provide a background in the technology and the patent

22 at issue, and it may help to put things into context

23 to go through those slides, unless Your Honor would

24 like me to proceed directly with the order-of-steps

25 term.

1          THE COURT:  You can spend your time

2  whatever way you wish.  I haven't seen diagrams like

3  this since Chemical Engineering 101, so it is a good

4  refresher for me.

5          MR. GINSBERG:  So I think I will just

6  briefly go through the background and the patent at

7  issue, and then we will go back to the first term.

8          So if you could go to Slide 3 of our

9  presentation, soda ash, which has the chemical name

10  sodium carbonate, is a versatile raw material that has

11  many applications.  It is used to lower melting point

12  in glass.  It's used as an anti-caking agent and

13  stabilizer in food products and as an acidity

14  regulator in water softener, just to name a few.

15          Now, the most common natural source of

16  soda ash is from mined trona.  Trona is an evaporative

17  mineral, large deposits of which can be found in two

18  locations in the world.  One is in Green River,

19  Wyoming, and the other one is in the Ankara region of

20  Turkey.  Now, trona ore can be drug out and brought to

21  the surface for processing.  This is known as dry

22  mining.  Or the ore can be dissolved underground and

23  the solution brought to the surface for processing,

24  and that's called and referred to as solution mining.

25          So solution mining involves injecting

1   water or a water-based solution into a mine,

2   dissolving the ore, creating a mine brine, and then

3   pumping the mine brine to the surface and processing

4   the mine brine.  And that is exactly what the asserted

5   patent is directed to.  It is specifically to one

6   method of processing a mine brine.

7                  Now, the most widely practiced method

8   of recovering soda ash is through the direct

9   evaporative crystallization of sodium carbonate

10  monohydrate.  We have in this slide a passage from an

11  authoritative textbook on soda ash mining and

12  manufacturing that was published way back in 1992.

13  That is the Garrett book.

14                 Crystallization refers to on the next

15  slide the process by which dissolved molecules

16  precipitate in a relatively pure crystalline state

17  from a pregnant solution.  The remaining solution

18  after crystallization is known as a mother liquor.  So

19  I give you that context because this is where the term

20  "mother liquor" comes from.

21                 Next slide.  Now, depending on

22  processing conditions, sodium carbonate can

23  crystallize in several different forms, including

24  decahydrate, which means that it has ten water

25  molecules; monohydrate, which means that it has one

1   molecule.  And sodium carbonate monohydrate crystals

2   are a direct precursor to the commercially desirable

3   dense soda ash commodity that is at issue in this

4   case.  The patent claims a method of optimizing the

5   recovery of sodium carbonate monohydrate crystals.

6                 Turning to the '497 patent, so this

7   patent was filed back in June of 2001.  With term

8   extension, it is set to expire on July 13, 2021, so in

9   about nine months, before we get to trial.  It

10  identifies one inventor, David Smith, and it is

11  entitled "Process for Preparing Soda Ash from Solution

12  Mined Bicarbonate Brines."

13                The current invention, as set fourth

14  throughout the specification -- you can see this on

15  the next slide -- relates to a process for obtaining

16  commercial-grade soda ash by direct processing to a

17  monohydrate crystallizer.

18                Slide 11.  The '497 patent claims a

19  seven-step process for recovering sodium carbonate

20  monohydrate from a mine brine, and that includes an

21  evaporation-stripping step, a neutralizing step, a

22  monohydrate crystallization step, separating

23  monohydrate crystals from their mother liquor,

24  decahydrate crystallization step, separating

25  decahydrate crystals from their mother liquor, and

1  then finally, recycling decahydrate crystals back to

2  the monohydrate crystallization step.  And this is, as

3  you see in these slides that we have just gone

4  through, Your Honor, this is from Figure 2 of the '497

5  patent, with our annotations shown in red.

6            Now, each of the individual steps

7  recited in Claim 1 was well known in the art and

8  routinely used in various arrangements to process mine

9  brine.

10           Next slide.  Here for the presentation

11 we have a front page from the Copenhafer patent.  That

12 patent was filed back in February of 1994.  It

13 identifies three inventors, one of which is David

14 Smith, who is the sole inventor on the '497 patent at

15 issue.  And like the '497 patent, the Copenhafer

16 patent is directed to a process for producing

17 commercial-grade soda ash from a solution mine brine.

18           What we have on this next slide here

19 is we have annotated Figure 2 from the Copenhafer

20 patent in red, and it shows that each of the claimed

21 steps that are recited in the '497 patent are

22 disclosed in the prior-art Copenhafer patent.

23           Now, it is interesting that Genesis is

24 opposing our order-of-steps requirement because, as

25 set forth in our briefing, the order of steps is what

1    the examiner indicated to be allowable subject matter,

2    and the applicant agreed.  All that said, we think

3    there is plenty of prior art that renders this patent

4    invalid, including the Copenhafer patent, but it is

5    interesting that Genesis is actually fighting us on

6    the order of steps, because they all appear in the

7    Copenhafer prior-art patent.

8                    So there are several claims to be

9    construed.  On Slide 24 we have the agreed-upon

10   constructions for three of the terms.  And as

11   Mr. Black correctly noted at the beginning of the

12   presentation, Ciner has agreed to Genesis' proposal to

13   apply the plain and ordinary meaning to the term "the

14   recovered mine brine."

15                   So now turning to the first term where

16   the parties still have a dispute, that's the order-of-

17   steps term that Mr. Black just went over.  Ciner's

18   proposed construction is that steps 1(a) to 1(g) must

19   be performed sequentially.  That's how the claim is

20   written.  That's how each of those process elements

21   are described in the specification.  Genesis' response

22   was that the steps 1(a) to 1(g) do not need to be

23   performed sequentially.  That is contrary to the

24   teachings of the specification and contrary to what

25   Genesis told the Patent Office during prosecution.

1          Now, in its briefing Genesis cites to

2   the Altiris case for the proposition that it is

3   Ciner's burden to show that the steps must be

4   performed in the ordinary written as a matter of logic

5   or grammar or that the rest of the specification

6   directly or implicitly requires such a narrow

7   construction.  It is in the briefing.  It is under

8   Slide 4.

9          Now, as an initial matter, we don't

10  read the Altiris Federal Circuit decision as placing

11  the burden on Ciner, but regardless, Ciner maintains

12  that both the grammar and logic of the claim language

13  as well as the teachings of the specification as a

14  whole make clear that the recited steps must be

15  performed sequentially.

16          Next slide.  Genesis' proposed

17  construction recites that steps 1(a) to 1(g) do not

18  need to be performed sequentially, but they concede

19  that steps 1(a) to 1(c) must be performed in order.

20  They concede that right on page 12 of their brief, and

21  I believe Mr. Black conceded that in his presentation.

22  He also put up a cake recipe to support their argument

23  that some steps might require order; others not.  With

24  all due respect, this is not a recipe for making a

25  cake, Your Honor.  This is a claimed invention

1    directed to a very specific method of solution mining

2    to recover sodium carbonate monohydrate.

3                    Now, in its briefing Genesis also does

4    not dispute that steps (f) and (g) must be performed

5    in order.  So the only dispute is whether the first

6    mother liquor from the mono crystallization step 1(c)

7    can be fed directly to the deca crystallization step

8    1(e) without an intervening separating step.  And

9    that's simply not supported by the specification, and

10   it runs contrary to the language of the claim.

11                   We have a couple of cites on this next

12   slide, the Altiris decision and the Kaneka decision.

13   We describe that in our briefing.  I will just move

14   on.

15                   So going through the steps of the

16   claim, so we have the claim language confirming that

17   the recited steps require order.

18                   Step (a), the recovered mine brine is

19   fed to an evaporation- stripping step from which a

20   concentrated brine is formed.

21                   Then we have step (b), a portion of

22   the remaining sodium bicarbonate in the concentrated

23   brine is then neutralized to form a crystallizable

24   solution.

25                   Step (c), the crystallizable solution

1    is then fed to a monohydrate crystallization step to

2    form a first mother liquor.

3                    Step (d), sodium carbonate mono

4    crystals are then separated from the first mother

5    liquor.

6                    Step (e), a portion of the resultant

7    mother liquor is then fed to a decahydrate

8    crystallizer to form a second mother liquor that

9    contains decahydrate crystals.

10                   Step (f), the decahydrate crystals are

11   then separated from the second mother liquor.

12                   And finally, the decahydrate crystals

13   are then recycled back to the monohydrate

14   crystallization step.

15                   Clearly, a logical order is following

16   and flowing through this claim.  Logic and grammar

17   clearly dictates that order be applied to the

18   construction of Steps (a) through (g).

19                   On the next slide we focus just on

20   steps (c) through (e), since Genesis does not dispute

21   that (a) through (c) and (f) through (g) must be

22   performed in order.  Now, the dispute concerns whether

23   the mono crystal-containing mother liquor is first

24   passed to a separating step before the resulting

25   mother liquor is passed to a decahydrate

1    crystallization step.  This is precisely the point

2    Your Honor clued in on.  Now, the language of the

3    claim and the teachings of the specification make

4    clear that it is.  You have step (c) forms a slurry

5    comprising both monohydrate crystals and a first

6    mother liquor.  Step 1(d) takes the crystals out of

7    the slurry, leaving behind the liquid they had been

8    in.  And then step (e), the remaining liquid from step

9    1(b) and not the monohydrate crystals are fed to a

10   secondary crystallization step, the decahydrate

11   crystallization step.

12                    Next slide.  Now, I won't spend too

13   much time on this because Mr. Black didn't go into it

14   in his presentation, but in its briefing Genesis

15   argued that the claims recite a continuous loop, in

16   support of its position that the order of steps is not

17   required, but this is of no moment.  As the

18   specification makes clear, the recovered mine brine

19   introduced to the process always goes through the

20   steps in order.  And this makes logical sense because

21   the sodium carbonate mono crystals that are separated

22   out -- that is 262 on Figure 2 -- are the direct

23   precursor to the commercial soda ash product that is

24   the end result of the process.

25                    Per Genesis' construction, you would

1    be passing along already formed mono crystals to the

2    second crystallizing step.  The alleged invention is

3    what to do with the formed mono crystals after the

4    mono crystallization steps.  The specification does

5    not disclose and Claim 1 does not recite feeding the

6    slurry with the monohydrate crystals and mother liquor

7    from the monohydrate crystallization step to the

8    decahydrate crystallizer without an intervening

9    separating step, which I believe Mr. Black conceded.

10              The next few slides, we have passages

11   from the specification that supports Ciner's

12   construction.  Column 5, lines 7 to 9 is up on the

13   screen and a portion of Figure 2.  The specification

14   confirms that all of the monohydrate crystal-

15   containing mother liquor formed in step (c) goes to

16   the separating step before any of the resulting mother

17   liquor goes on to the step (d) decahydrate

18   crystallization step.

19              Next slide.  And here is the passage

20   demonstrating that the sodium monohydrate crystals,

21   262, are separated from the first mother liquor before

22   any of the resultant mother liquor 261 goes to the

23   decahydrate crystallizer.

24              Next slide.  Here is another passage

25   confirming that the feed stream from the monohydrate

1    crystallizing step (c) is first fed to a separating

2    step (d) before any of the resultant mother liquor is

3    fed to a decahydrate crystallization step.

4              So as set forth in its briefing,

5    Ciner's construction is also supported by the

6    prosecution history, as the examiner relied on the

7    order of steps in allowing the claims, and the

8    applicant agreed.  And this is discussed at the joint

9    claim construction brief on page 20, which includes

10   citations to the prosecution history that can be found

11   attached to the joint claim construction chart, which

12   is Docket Entry 55 at Exhibits C and D.

13             Now, next slide.  Genesis' argument

14   that Ciner's proposed construction precludes use of

15   the suitable for deca feed recited in step (c) in the

16   deca step (e) is simply incorrect.  Without separation

17   you would be sending already formed monohydrate

18   crystals, the recovery of which, as I noted, is a goal

19   of the claimed invention, to a second crystallization

20   step.  This is not what is disclosed or claimed in the

21   '497 patent.  In its briefing and on Slide 11 of its

22   presentation Genesis resorts to doctoring Figure 2, to

23   draw a line from the mono crystallizer step 1(c) to

24   the decahydrate crystallizer step 1(e), and argued

25   that the --

1                    THE COURT:  Let me just stop you for a

2     second, though.  So I think what I hear Mr. Black

3     saying today is that he is skipping a centrifuge, but

4     no centrifuge is required.  If that green line, for

5     example, included some sort of a separation step, then

6     what would the dispute here be?  What would your

7     dispute be with that?

8                    MR. GINSBERG:  I am not entirely clear

9     what Mr. Black is saying by that, because that to me

10    confirms that he is conceding that there is a separate

11    intervening separating step between the monohydrate

12    crystallizing step and the decahydrate crystallizing

13    step, whether it is done by a centrifuge or there is

14    another separating mechanism for doing that.

15                   THE COURT:  Well, he is saying the

16    separating mechanism is just the simple fact that

17    there are portions of the monohydrate crystallizer

18    that have no crystals in it and you can just draw a

19    feed line off of that portion.

20                   MR. GINSBERG:  But that feed line that

21    he is drawing, that is not disclosed anywhere in the

22    specification, Your Honor.  There is nowhere that that

23    is disclosed.  That line, that green line doesn't

24    appear in Figure 2.  Genesis drew that in, and it is

25    just simply attorney argument here.  And, in fact, in

1   the passage that it cites in support of its improper

2   line-drawing, which is at Column 9, line 64 of the

3   patent to Column 10, line 1, that actually is directed

4   to an unclaimed embodiment depicted in Figure 1.  And

5   if you look at Figure 1 and the embodiment that is

6   described, it doesn't even include a decahydrate

7   crystallizer step.  We made this point in the

8   briefing.

9            And here on the next slide we point to

10  as Figure 1, it does not contain a decahydrate

11  crystallizer, and therefore, it does not perform claim

12  step 1(e).  And therefore, that passage that they cite

13  is irrelevant to the source of the decahydrate feed

14  brine.  In fact, in the very next passage of the

15  specification upon which Genesis relies, it teaches

16  recycling the monohydrate mother liquor back to the

17  monohydrate crystallizer, not to a decahydrate

18  crystallizer.  That is at Column 10, lines 1 through

19  5.

20           Again, Claim 1 does not recite sending

21  a monohydrate crystal-containing mother liquor to a

22  second crystallizing step prior to any separation of

23  the already formed monohydrate crystals, and Genesis'

24  improper annotation of Figure 2 does not change this

25  fact.

1          Now, on Slide 6 of Genesis'

2     presentation it asserts that only three steps are

3     explicitly called out as steps.  While it remains

4     unclear what point Genesis is making with such an

5     assertion, there can be no legitimate dispute that the

6     recited steps (a) through (g) in method Claim 1 are

7     indeed steps.  And tellingly, Genesis refers to them

8     as steps throughout its briefing.

9          Moving on to the next slide.  Now,

10    there is a problem -- and this is dove-tailing into

11    the indefiniteness issue -- with the wording of Claim

12    1, as it recites the formation of two "a" first mother

13    liquors.  The first "a mother liquor" is formed during

14    the monohydrate crystallizing step (c), and the second

15    "a first mother liquor" is formed after the

16    monohydrate crystals are separated from the first

17    mother liquor in step (d).

18          Genesis argues, if we turn to the next

19    slide, that the first mother liquor of step 1(e) is

20    "agnostic as to whether its feed comes from the

21    monohydrate crystallizer or the separation process."

22    It also states that the "first mother liquor can be

23    fed to element 1(e) directly from element 1(c)...,

24    element 1(d)..., or both."  Now, if Genesis' position

25    is accepted, Claim 1 would be rendered indefinite.

1          And just to put this into context, I

2    just have a few slides here how this indefiniteness

3    problem arose, which confirms that the order of steps

4    was critical to what the applicant was seeking, was

5    discussed in the specification, and how the examiner

6    believed the claims to be allowable.

7          The claim as originally drafted

8    distinguished between the first mother liquor formed

9    in step 1(c) and the first mother liquor formed in

10   step 1(d) by using the language "substantially

11   crystal-free first mother liquor" to modify the mother

12   liquor formed as a result of the separating step 1(d).

13   As noted, it is further confirmed that the applicant

14   understood his invention to require that the

15   monohydrate crystals in the mother liquor formed in

16   step (c) are separated out before the resultant mother

17   liquor is passed along to the decahydrate

18   crystallization step.

19          Now, during prosecution the examiner

20   rejected that claim on 112 grounds, finding

21   "substantially crystal-free" indefinite.  He wasn't

22   certain what "substantially crystal-free" meant.  So

23   in response -- next slide -- the applicant simply

24   deleted the phrase "substantially crystal-free."

25          Now, turning to the next slide, the

1    only reasonable way for this second "a first mother

2    liquor" term to be understood by a person of ordinary

3    skill in the art would be if the steps of the claim

4    were required to be performed in order.  Then the

5    mother liquor of step (e) would be understood to be

6    the first mother liquor that has been subjected to the

7    separating step (d) and had its monohydrate crystals

8    removed therefrom.  Otherwise, the claim is

9    indefinite.

10                   So Ciner's position regarding why the

11   claim would be indefinite is further addressed in

12   connection with "the first mother liquor" term.  So I

13   think Mr. Black has agreed that we can proceed with

14   just some further explanation on the indefiniteness

15   position.  And since it is Ciner's burden of proof to

16   demonstrate indefiniteness, I would just continue on,

17   unless Your Honor has any questions.

18                   THE COURT:  No.  Please proceed.

19                   MR. GINSBERG:  So if we can turn to

20   Slide 96 of the presentation.  So as we were

21   discussing, "first mother liquor."  That term appears

22   in step 1(c) and 1(d), "a first mother liquor,"

23   recited in both (c) and (d).

24                   Now, step (e) calls for feeding at

25   least a portion of the first mother liquor.  Which "a

1    first mother liquor" is that?  If you were to accept

2    Genesis' proposed construction, it can be either the

3    "a first mother liquor" of (c) or "a first mother

4    liquor" of step (d).  That renders the claim

5    indefinite.

6                    Slide 100.  There is an antecedent

7    basis defect in the claim, and Genesis' own positions

8    highlight the indefiniteness problem.

9                    On the next slide we have a couple of

10   cases:  One from the Nautilus Supreme Court decision,

11   another from the Haliburton case.  A claim is invalid

12   as indefinite "if a term does not have proper

13   antecedent basis where such basis is not otherwise

14   present by implication or the meaning is not

15   reasonably ascertainable."  Exactly the situation that

16   we have here.

17                   Claim 1 uses the term "a first mother

18   liquor" in two different ways.  Step 1(c) refers to

19   forming a slurry comprising sodium carbonate

20   monohydrate crystals and a first mother liquor.  That

21   is the 1(c) first mother liquor.  Step 1(d) recites

22   separating the sodium carbonate monohydrate crystals

23   from the first mother liquor to form "a first mother

24   liquor."  That is the 1(d) first mother liquor.

25                   Step 1(e) describes feeding at least a

1    portion of the first mother liquor to a sodium

2    decahydrate crystallization step.  Step 1(e) is

3    unclear because the first mother liquor could refer to

4    the 1(c) first mother liquor, the 1(d) first mother

5    liquor, the 1(c) first mother liquor and the 1(d)

6    first mother liquor.

7              Similarly, Claims 8 and 9 use the same

8    confusing "the first mother liquor" language with no

9    indication as to which first mother liquor is being

10   referred back to.

11             So the question at issue is whether

12   the claims inform a person of ordinary skill in the

13   art with reasonable certainty whether the first mother

14   liquor of step 1(e) and Claims 8 and 9 refers to the

15   1(c) first mother liquor or the 1(d) first mother

16   liquor.  Per Genesis, it refers to either or both.

17   That interpretation renders the use of "the first

18   mother liquor" indefinite as a matter of law.

19             And we included in our briefing a

20   couple of cites that support that where in similar

21   situations courts have identified claims as

22   indefinite.  This is from the Sensor case on this

23   slide.  "Claim 11 does not supply the antecedent basis

24   for 'the material' because claim 11 mentions 'a

25   material' twice....Therefore, it is ambiguous whether

1   the claim term 'the material' refers to 'a first layer

2   composed of a material,' or a 'second layer composed

3   of a material,' or both."  Precisely the situation

4   that we have here.

5              We have another citation here to the

6   Implicit case.  Same indication was applied from the

7   Court, finding -- indicating its belief that the lack

8   of antecedent basis rendered the claim unclear.

9              The Manual of Patent Examining

10  Procedure explains that -- gives an example here of

11  precisely the same of type of indefiniteness issue

12  that we have in the '497 patent.  "If two different

13  levers are recited earlier in the claim, the

14  recitation of 'said lever' in the same or subsequent

15  claim would be unclear where it is uncertain which of

16  the two levers was intended."

17             Now, next slide.  Despite Genesis'

18  argument to the contrary, the specification confirms

19  that the 1(c) first mother liquor is different than

20  the 1(d) first mother liquor.  Here are the portions

21  of the specification talking about Example 2 that

22  teaches that the 1(b) first mother liquor has a

23  different composition than the 1(c) first mother

24  liquor(d).  The 1(d) first mother liquor contains some

25  wash water from washing sodium carbonate monohydrate

35

1     crystals, and the addition of this wash water and

2     associated impurities are not present in the 1(c)

3     first mother liquor.  They are two different a first

4     mother liquors.

5                   So next slide.  If the Court adopts

6     Ciner's proposed construction on order of steps, the

7     first mother liquor in step 1(e) would be understood

8     to refer to the first mother liquor that has been

9     separated from the monohydrate crystals in step 1(d).

10    If steps 1(c) to 1(e) are not required to be performed

11    in order, as Genesis proposes, Claim 1 is indefinite.

12    Certainly that's a result that Ciner would be more

13    than happy for Your Honor to adopt, and if that's Your

14    Honor's position, then we will take it.

15                   Now, Claims 8 and 9 are indefinite

16    under either construction.  They can't be cured even

17    if Ciner's construction is adopted because there is

18    absolutely no indication, no flow in Claims 8 and 9 to

19    give a person of ordinary skill in the art any

20    information as to which "the first mother liquor" is

21    being recited.  So those claims should be found

22    indefinite regardless.

23                   THE COURT:  Well, let me ask you,

24    because most of your argument is this conditional

25    argument where if I don't agree with you about the

1    order of steps, that it is indefinite.  And what I

2    didn't see in your brief is an explanation about why 8

3    and 9 but not 1(e) would be indefinite.  I see one

4    conclusory sentence on page 66.  You say, "Under any

5    construction, Claims 8 and 9 are invalid as

6    indefinite. . . ."  But I don't see any explanation as

7    to why that would be.

8                   MR. GINSBERG:  Understood, Your Honor.

9    And the explanation is as follows.  So if Your Honor

10   adopts Ciner's construction on order of steps, (c)

11   comes before (d), (d) comes before (e).  And that way,

12   a person of skill in the art would know that the first

13   mother liquor comes from step (e).  The first mother

14   liquor recited in step (e) comes from step (e).  That

15   is -- and I will just repeat it just because my audio

16   apparently went out.

17                  So to answer your question, Your

18   Honor, the difference between Claims 8 and 9

19   indefiniteness issue and the indefiniteness issue in

20   Claim 1 is as follows:  If the order-of-steps position

21   that Ciner is advancing is adopted by Your Honor, a

22   person of skill in the art would clearly understand

23   that the first mother liquor being referred to in step

24   (e) comes from after the separating step 1(d), when

25   the monohydrate crystals are removed.  That would

1    follow logically from the grammar and logic of the

2    claims as construed.

3                    For Claims 8 and 9, there is no

4    indication -- since there is no order of steps recited

5    in those claims, just reading those claims, it is

6    entirely unclear which "the first mother liquor" is

7    being referred to.  It could be the first mother

8    liquor formed in 1(c) or 1(d), and that wouldn't be

9    cured even if Your Honor adopts the order-of-steps

10   proposal advanced by Ciner.

11                   Did that answer your question?

12                   THE COURT:  Not really.  And I guess

13   why I am asking is this:  Step 1(c) talks about a

14   slurry that contains the first mother liquor and

15   crystals.  And if Claims 8 and 9 are referring to just

16   the mother liquor portion of that slurry, wouldn't the

17   answer about what the sodium chloride and sodium

18   sulfate levels are in Claim 8 or the sodium sulfate

19   and sodium chloride levels are in Claim 9, wouldn't it

20   be exactly the same if you measured it in 1(c) or

21   1(d)?

22                   I mean, I am not a person of ordinary

23   skill in the art, but your argument would be a lot

24   better if you had a separation or something from

25   someone saying that those would be different.

1             MR. GINSBERG:  We think, Your Honor --

2   and I understand that, Your Honor.  And we think that

3   the language of the claim, you know, is clear without

4   an expert declaration on this point.  And this refers

5   back to, if you can put back up Slide 114.  As the

6   specification makes clear -- and this is why we

7   believe we do not need a declaration, because the

8   specification to us unequivocally demonstrates that

9   the composition of the first mother liquor in step

10  1(c) is different than the composition of the first

11  mother liquor in step 1(d).

12            THE COURT:  I can understand that a

13  slurry is different in 1(c) and 1(d), but a slurry is

14  just two components that are physically separated in

15  1(d); right?  So I guess I am trying to understand.

16            If you had somebody that was a

17  scientist that was telling me that once you separate

18  out the crystals in 1(d), that you are going to get a

19  mother liquor with different sodium chloride and

20  sodium sulfate content, I would be a little suspicious

21  of that person's opinion, but at least I would have

22  some evidence in the record.

23            MR. GINSBERG:  I understand, Your

24  Honor.  I guess the problem that we are having is that

25  the wash water can affect the composition, and what

1    you are left with is your having to test both two "a"

2    first mother liquors because the patent isn't giving

3    you guidance which first mother liquor is being

4    referred to.

5              THE COURT:  Okay.  That's fair.

6              MR. GINSBERG:  So unless Your Honor

7    has any other questions, you know, for all those

8    foregoing reasons, you know, based on the

9    specification, the claim language, the prosecution

10   history, Ciner maintains that the claims unequivocally

11   do require an order of steps, and if the Court

12   disagrees, then Ciner maintains that the claim should

13   be found indefinite because of the first mother liquor

14   antecedent basis issue effect that I identified.

15             With that, I will turn it back over to

16   Mr. Black.

17             THE COURT:  I think, Mr. Black, you

18   might be on mute.

19             MR. BLACK:  Can you hear me?

20             THE COURT:  Yes.

21             MR. GINSBERG:  I can't believe he did

22   that.

23             MR. BLACK:  I didn't actually do it.

24   I just wasn't speaking because I was struggling to get

25   the PowerPoint up.

1          THE COURT:  Okay.  Let the record

2    reflect your lips were moving, Mr. Black.  Go ahead.

3          MR. BLACK:  Okay.  All right.  So I

4    want to be clear about the issue about 1(c), 1(d) and

5    1(e).  You, of course, are correct, Your Honor, that

6    when you have a slurry, that has to be separated out,

7    and that's what 1(d) is referring to.  That's the step

8    which creates the mono crystals, which are then dried

9    to get the final product.  But the mother liquor is

10   created in the crystallizer.

11          And this is a picture of a

12   crystallizer.  And what it shows is that there is a

13   zone behind the baffle, which is described in the

14   patent, which is quiescent, where you can isolate the

15   mother liquor.  At the bottom, if you took the

16   contents of the bottom, you are going to get a slurry,

17   which is siphoned off where it says "product," and

18   that has to be separated if you want to use the mother

19   liquor from that embodiment.  But you also have mother

20   liquor that is available at the top of the

21   crystallizer, and if that's sufficient to feed the

22   decahydrate crystallizer, that certainly meets element

23   1(c)'s requirement.

24          What we are concerned about is a

25   construction which would give them a leg up on the

1    jury to argue that the mother liquor, once it is

2    created in the mono crystallizer, must first be

3    separated from the slurry, and only the separated

4    mother liquor from the slurry can be used to feed the

5    deca crystallizer.  That's not what the claim says.

6    The claim says in 1(c) you create the mother liquor,

7    and then it says a mother liquor has to be fed to the

8    deca crystallizer.

9                    So to the extent their construction is

10   meant to limit us, it is incorrect, and it is

11   inconsistent with the specification as well, which

12   does describe the possibility of using the mother

13   liquor from behind the baffle in the crystallizer.

14                   With respect to indefiniteness, we

15   agree completely, Your Honor.  There is a process

16   problem.  I don't mean a chemical process.  There is a

17   legal process problem, which is that the standard is

18   that one of skill in the art would not understand the

19   metes and bounds of the claim.  And we don't have a

20   declaration.  I expect we will have a disagreement

21   among the experts if we do see one.  But this isn't a

22   case where the claim is so drafted in a way which

23   makes it utterly incomprehensible and there is no

24   antecedent basis.  In order to understand whether the

25   claim would instruct one of skill in the art on its

1    metes and bounds, you have to understand what "mother

2    liquor" means to one of skill in the art and the point

3    Your Honor was on to, which is if the first mother

4    liquor is formed in the crystallizer, then why can't

5    that be the same mother liquor.  It is in some cases

6    alone in the crystallizer.  In some cases it is in the

7    slurry.  In other cases it is separated.  And that is

8    something we would need experts for.  So the

9    indefiniteness issue is at the minimum premature.

10              MR. GINSBERG:  Your Honor, can I just

11   have -- I am sorry, Mr. Black.  Were you finished?

12              MR. BLACK:  Yes, one more thing.  The

13   patent -- the other thing, the patent describes the

14   use of the mother liquor, the mono mother liquor in

15   many different places.  It can be sent to the

16   centrifuge.  It can be purged.  It can be recycled to

17   mono.  It can be drawn out from the slurry.  It can be

18   sent.  It can be used for a lot of different things.

19              The sense in which the patent used the

20   mother liquor, the first mother liquor, is it is the

21   mother liquor created in the crystallization step, and

22   there are two crystallization steps, so there are two

23   different mother liquors.  The definition of a mother

24   liquor:  "Liquid remaining after the chief

25   constituent, as a precipitate, has been separated

1    out."  So that's it.

2                 The liquid that you get in the mono

3    crystallizer is the first mother liquor, and the

4    liquor that you get in the deca crystallizer is the

5    second mother liquor.  And the claim makes perfect

6    sense when you look at it that way.  Now, those mother

7    liquors might be subject to further processing,

8    separation, whatever.  But they are created in the

9    crystallization process and only in the

10   crystallization process.  That's the sense in which

11   the claim was drafted.  That's what it means.  And at

12   the minimum, we should have experts before the Court

13   makes any ruling with respect to indefiniteness.

14                 That's all I have, Your Honor, unless

15   you have some further questions.

16                 THE COURT:  I don't have any further

17   questions.  I think we did have a request to be heard

18   briefly.  Mr. Ginsberg, you can go ahead.  I will let

19   Mr. Black talk last, though, if he has a response to

20   what you have to say.

21                 MR. GINSBERG:  Thank you, Your Honor.

22   The first point that I will make is Mr. Black doesn't

23   engage in the fact that step 1(d) requires the

24   formation of a first mother liquor, distinguishing

25   between the first mother liquor that is formed in

44

1    1(c).

2                    Mr. Black in his rebuttal also spent a

3    lot of time on this Slide 35 from this 2019

4    publication.  As an initial matter, Your Honor,

5    Mr. Black -- and correct me if I am wrong -- this

6    figure appeared nowhere in their claim construction

7    briefing.  The first time that we saw it was when we

8    received their presentation on Friday.  But that

9    figure from 2019 doesn't change the complete lack of

10   disclosure of any of the mother liquor going from the

11   monohydrate crystallization step to the decahydrate

12   crystallization step without any separation.  And

13   instead of referring to the specification, Mr. Black

14   relies on this 2019 publication.

15                   What was actually cited in Genesis'

16   briefing, the citation of Column 9, line 64 to Column

17   10, line 1, that was referring to the Figure 1

18   embodiment, which doesn't have a decahydrate

19   crystallization step.  So what happened, you know, 19

20   years later, this figure that they are now putting

21   into their slide presentation is of no moment, and it

22   is irrelevant to what is taught by the specification

23   of the patent at issue.

24                   THE COURT:  Thank you, Mr. Black.

25                   MR. BLACK:  Yes, Your Honor.  We

1   provided a picture of a standard crystallization

2   process.  There is nothing magical about this from

3   2019.  It is a demonstrative to show the Court a point

4   which Your Honor had already intuited, which is that

5   there is mother liquor at the top of the crystallizer.

6   That's the sole purpose of it.

7              With respect to the patent itself, it

8   says that the mono crystallizer 150, which is the same

9   mono crystallizer used in the second embodiment; "It

10  is understood that sodium carbonate monohydrate mother

11  liquor may also be removed from a quiescent,

12  relatively crystal-free zone in a sodium carbonate

13  monohydrate crystallizer. . . ."  That shows that the

14  monohydrate crystallizer creates its own mother

15  liquor, which can be siphoned off for different uses.

16             Now, the argument he is making is a

17  written description or support issue about whether or

18  not our claim is supported.  But the idea that you

19  must perform a separation process in some sort of

20  evaporator or formal separator before you can obtain

21  what the patent considers to be mono mother liquor is

22  flatly contradicted by Column 9, line 53 through line

23  67.  It is just wrong.

24             And what they are trying to do here is

25  they are trying to conflate the separation process,

1    which is necessary to isolate the crystals and get the

2    final product, which is a requirement element of the

3    claim, with the requirement that you isolate in some

4    way mother liquor to be sent to the deca process.

5                    THE COURT:  It does seem curious to

6    me -- and since I didn't ask this of Mr. Ginsberg, I

7    will give you each a chance to say something when

8    going through this -- that no one asked me to construe

9    the separating step, because it does seem to me that

10   that is actually where the disagreement lies, if, in

11   fact, there is a disagreement.  So, Mr. Ginsberg, any

12   comments about that?

13                   MR. GINSBERG:  That was actually, Your

14   Honor, one of the agreed-to terms.  So I am pulling it

15   up right now.  One second.  I apologize.

16                   MR. BLACK:  Yes, we agreed to the

17   separation step and what "separation" means in 1(d).

18   If you have the slurry and you want to create the

19   crystals, you have to separate it, and we eventually

20   agreed on a definition.

21                   But the mother liquor which is created

22   in 1(c) that is sitting at the top of the tank we

23   contend is one option available to feed the deca

24   crystallizer.

25                   MR. GINSBERG:  And, Your Honor, if I

1    may, and that agreed-upon construction actually

2    supports Ciner's position here; that the agreed-to

3    term was separating out the sodium carbonate

4    monohydrate crystals that are suspended in the first

5    mother liquor.

6              MR. BLACK:  That's right, because in

7    that step, which is directed to isolating the crystals

8    for the final product, which is required by the claim

9    and we will prove exists, in that step you need to do

10   that.  But you don't need to have a special separation

11   process, a special separator, a required intermediate

12   step to just draw off mother liquor that has been

13   created in the mono crystallizer.  If it has the

14   characteristics sufficient to feed the deca

15   crystallizer, it meets the requirements of the claim.

16   And it is described in the patent.

17              So that's the issue, Your Honor.

18              THE COURT:  Yes.  Mr. Ginsberg, I will

19   let you have one more chance, since Mr. Black took

20   another opportunity.

21              MR. GINSBERG:  Thank you, Your Honor.

22   The claims are clear.  Mr. Black keeps saying you

23   don't need the separating step; you can go right from

24   (c) to (e).  But there is a separating step

25   indisputably recited in the claims, which Mr. Black is

1    saying we should just read out.

2                    MR. BLACK:  I never said that.

3                    MR. GINSBERG:  And that's a problem.

4                    THE COURT:  Mr. Ginsberg, what do you

5    make of Column 9, lines 18 to 27 that talks about

6    other separation apparatuses such as, and then it

7    refers to filters and settling tanks?  Does that have

8    any bearing on what I am being asked to decide here?

9                    MR. GINSBERG:  In our opinion, Your

10   Honor, it does not.  You know, again, in the passage

11   that you just cited it is referring to the Figure 1

12   embodiment, which does not include a decahydrate

13   crystallizer.  And, you know, filtering, you know,

14   this is something that was also briefed.  You know,

15   optionally, filtering a stream to remove insolubles is

16   irrelevant to the construction of the terms at issue.

17   You know, whether or not some liquid is diverted to

18   another process is not really germane to the issue

19   that we are trying to decide here.

20                   There is no question that there is a

21   separate separating step, and that follows the step

22   1(c) monohydrate crystallizing step.  You are taking

23   out the crystals that are formed in the monohydrate

24   crystals.  You are separating them out before you take

25   the resultant mother liquor and feed it into the

1    decahydrate crystallizer.

2                    THE COURT:  All right.  I think I have

3    heard enough about this dispute.  Let's go on to the

4    next term.

5                    MR. BLACK:  Thank you, Your Honor.

6    The next term is the evaporation-stripping.  Okay; an

7    evaporation-stripping step.  Now, we really have two

8    issues here.  Ciner's construction is that it is a

9    step including an evaporator and a stripper, which are

10   process elements, and they are converting evaporation

11   and stripping into specific things, an evaporator and

12   a stripper.  And we are going to talk a little bit

13   about why that is wrong just as a matter of

14   construction.  That's not the way you should interpret

15   the language itself.  Evaporation is a process.  It

16   can be done in an evaporator, but it can also be done

17   in a stripper and combined units and other things.

18   And it would just be wrong and narrowing to limit the

19   claim to these specific process units.

20                   The other question is really what does

21   the dash between evaporation and stripping mean.  Does

22   it mean "and" or does it mean "and/or"?  And let me

23   start with that part.

24                   So the one place where we have

25   evaporation and stripping together in the

1  specification is right in the summary of the

2  invention.  And it says, "By evaporating and/or

3  stripping such a mine brine to concentrate sodium

4  values in the mine brine and convert at least a

5  portion of the remaining sodium bicarbonate therein to

6  sodium carbonate to form a concentrated brine."  And

7  we see that same language in the claim:  "Feeding the

8  recovered mine brine to an evaporation-stripping step

9  to," and then the language is almost verbatim what is

10  in the summary of the invention.

11              So in interpreting evaporation-

12  stripping step, we believe that the proper way to look

13  at it is evaporation and/or stripping.  Now, we aren't

14  reading anything out of the claim because you have got

15  to do these two elements which are part of the claim

16  in order to infringe.  You have to concentrate the

17  sodium content and you have to convert at least a

18  portion of the sodium bicarbonate to sodium carbonate

19  to form a concentrated brine.  Those two things have

20  to be done.  They have to be done by evaporation

21  and/or stripping.  And once that is done, you can move

22  on to the next step of the process.

23              The patent has a lot of disclosure on

24  this issue.  It talks about a stripper that can

25  perform both limitations.  You can do flashing, which

1   is evaporation in the stripper, and of course, you can

2   do stripping, which converts the sodium bicarbonate to

3   sodium carbonate, and that is shown here on Slide 24.

4                    The evaporator obviously can

5   concentrate sodium content through evaporation, and it

6   also can convert.  By running it hotter than

7   necessary, you can strip out sodium bicarbonate.

8                    So the patent shows how you can do

9   both functions in a stripper or an evaporator.  It

10  also talks about a combined concentrator-stripper here

11  on Slide 25.  So there is a mixing and matching of

12  different ways to do this in the art, but the point is

13  at the end of the day you have got to meet the two

14  limitations of the claim, to concentrate sodium

15  content and to convert at least a portion.

16                   THE COURT:  Can I ask you, Mr. Black,

17  can you do these two things without evaporation?  I

18  know you said you can do it without an evaporator, but

19  can you do it without evaporation?  Because my concern

20  is -- and maybe you can straighten me out -- you asked

21  for a construction that says evaporation and/or

22  stripping, which suggests that you don't even need

23  evaporation.  And I guess the question I have for you

24  is how can you concentrate something without

25  evaporation.

1                    MR. BLACK:  I think as a technical

2    matter, Your Honor, you may be right.  But as a claim

3    construction matter, their construction should not be

4    accepted.  I think it likely that there will be

5    evaporation in this case, Your Honor.  I don't want to

6    go into what is in the system because my client is on

7    the line.

8                    THE COURT:  What about a construction,

9    you know, something like evaporation, you know, plus

10   or minus stripping?  I throw it out there because your

11   examples of how this could all be done in a stripper

12   are examples that show that evaporation is occurring

13   in a stripper.  So I am sort of confused as to how I

14   could say that you don't need to have evaporation.

15                   MR. BLACK:  Well, what we need, Your

16   Honor, is to concentrate the sodium content, and that

17   is most commonly going to be done with evaporation of

18   some sort.  You are correct.  But we are just

19   construing the words, and that is probably what our

20   proof will be.  But we have got to construe the

21   claims, and they ask for a construction that turned

22   this method claim with a step into two specific

23   process units, which is not supported by the claim.

24   And we think that first should be rejected.

25                         And then the question is

1   evaporation-stripping, we don't think we should be

2   limited if we can meet the requirements of the claim

3   element here given the summary of invention, where it

4   says evaporation and/or stripping.  They contemplated

5   the possibility that it would all be done with

6   stripping.  There is in evaporation involved in

7   stripping is the issue.

8              THE COURT:  Well, that's why I am

9   confused.  So you agree, though, that both of these

10  functions have to be performed to meet the limitation

11  of the claim:  Concentrate the sodium content; convert

12  at least a portion of the sodium bicarbonate to sodium

13  carbonate.  Both of those things have to be done.

14             MR. BLACK:  Yes.  They need to be done

15  by a combination of evaporation, stripping or both,

16  and that's what the summary of the invention says.

17             What we are particularly sensitive to

18  is their getting a construction that says you must

19  have an evaporator and a stripper or you must have a

20  separate evaporation and stripping step, because a

21  stripper involves the application of steam and it is

22  going to involve some evaporation.  We don't want them

23  to put that in front of a jury and confuse the jury.

24  So what we need is a construction that is really

25  supported by the summary of the invention here, which

1    says evaporation and/or stripping, which it explicitly

2    says is capable of doing both of these things.

3              THE COURT:  Okay.  And I don't know

4    much about a stripping column, but you are not going

5    to be arguing -- what you are telling me right now is

6    you are not going to be arguing to the jury that you

7    don't need any evaporation.

8              MR. BLACK:  We might, Your Honor.  We

9    don't have full -- we don't have all the evidence yet

10   on their system.  But this is a claim construct, so

11   I'm not sure what we are going to be arguing at the

12   end of the day.  But we will meet "to concentrate

13   sodium content" and we will meet "convert at least a

14   portion of."  The summary of the invention says that

15   it is evaporation and/or stripping.  It clearly

16   contemplated being able to meet those elements without

17   doing evaporation at least in an evaporator.

18             THE COURT:  Okay.

19             MR. BLACK:  So those are really the

20   two issues, and I don't think I have anything to add,

21   Your Honor.

22             THE COURT:  Okay.  Let's hear from the

23   other side, unless you were going to keep on this

24   term, or were you going to go to the next term?

25             MR. BLACK:  No.  I think we are good,

1    Your Honor.  I think it is time for Mr. Ginsberg's

2    turn.

3                    THE COURT:  Okay.

4                    MR. GINSBERG:  Thank you.  So if we

5    could just pull up our presentation, Slide 61.  Okay.

6                    So here we have both sides'

7    construction.  Ciner's proposed construction is "a

8    step including an evaporator and a stripper."

9    Genesis' construction is "a step including evaporation

10   and/or stripping."  From Mr. Black's presentation, I

11   am not entirely sure where he landed, but clearly,

12   from the proposal that is being advanced by Genesis,

13   they are saying you can have evaporation and

14   stripping, evaporation only, or stripping only.  That

15   is something that is absolutely not contemplated by

16   the specification, the intrinsic record, the claims of

17   the patent.

18                    If you go to the next slide, so

19   Ciner's proposed construction gives meaning to all the

20   terms of the claim.  Genesis' does not.  Mr. Black

21   spent a lot of time pointing to that one passage in

22   the summary of the invention that mentioned

23   evaporation and/or stripping.  However, that is not

24   what was claimed.  The claims are crystal clear that

25   they call for evaporation-stripping.  It is

1    evaporation and stripping.  It doesn't say "or."  It

2    includes both evaporation and stripping into the

3    claimed step.

4              And the claim describes two separate

5    operations for evaporation and stripping.

6    Evaporation, as Your Honor correctly noted, is to

7    concentrate sodium content in the mine brine and to

8    convert at least a portion -- and in stripping is to

9    convert at least a portion of the sodium bicarbonate

10   therein to sodium carbonate to form a concentrated

11   brine.  If you look later into dependent Claim 6, it

12   explains that the stripping step converts first, and

13   then you have the evaporation step.

14             Next slide.  Now, every embodiment

15   disclosed in the '497 patent, claimed and unclaimed,

16   includes both a stripper and an evaporator to perform

17   these functions.  And this is highly indicative of the

18   scope of the claims.

19             Next slide.  Figure 1 depicts a

20   stripping column 105 and a brine evaporator 120.  That

21   is the Figure 1 embodiment.  That claim doesn't

22   include a decahydrate crystallization step but that

23   depicts both a stripping column and an evaporator.

24   Same thing with Figure 2.  We have the stripping

25   column to convert and the evaporator to concentrate.

1    That's the Figure 2 embodiment.  Two embodiments

2    described in the specification require both a stripper

3    and an evaporator.  It doesn't say you can do

4    stripping and/or evaporating, as Genesis proposes.

5                    Mr. Black didn't get into this, but I

6    believe in Genesis' briefing they were trying to make

7    some claim differentiation argument about Claim 6, but

8    Claim 6 makes clear that it is further limiting Claim

9    1 in that the stripping step occurs first, followed by

10   an evaporation step.  And it is clear that specifying

11   order is one form of claim differentiation.  I will

12   move on from there because Mr. Black didn't spend a

13   lot of time on that or at all during his presentation.

14                    Now, Genesis also points to portions

15   of the specification for the proposition that Claim 1

16   does not require use of an evaporator.  But each of

17   the identified disclosures describes a stripping step

18   followed by an evaporation step.  And we will just

19   quickly go through the passages.

20                    The passages that we go through --

21   you, should see in yellow, are the ones that are cited

22   by Genesis and talks about in the Figure 1 process you

23   have the mine brine going to a stripping step, a

24   stripping device.  And then what does it say right in

25   the same passage when it is talking about the exact

1   same process?  "Evaporator feed brine is then

2   concentrated in a brine evaporator."  So we will

3   continue to go through the portion of the

4   specification upon which Genesis relies, but they

5   didn't identify the portions in green that followed.

6               Here we have "an aqueous brine

7   contained sodium bicarbonate. . .is stripped of carbon

8   dioxide. . .within a stripping device," and then the

9   evaporator feed brine is concentrated in an

10  evaporator.

11              Another portion cited by Genesis.  You

12  have the mine brine going to a stripping step, to a

13  stripper, and then all of the stripped brine is

14  recovered from the stripping column and "may be

15  introduced to a brine evaporator."  It does say "may

16  be introduced," but in the passage in green the

17  specification makes clear that the process is being

18  used to optimize the recovery of sodium bicarbonate

19  monohydrate.  As is claimed, the recovered mine brine

20  is introduced to an evaporator.  The passage continues

21  that "Alternatively, the stripped brine may be

22  separated into two streams" for use in other

23  processes, such as the formation of caustic soda, but

24  that is not what is claimed.

25              Now, Mr. Black, if we go to the next

1    slide, also refers to the specification's disclosure

2    of flashing as satisfying the claimed evaporation

3    step, but flashing is not an operation defined in the

4    claims or identified in the claims.  It surely doesn't

5    describe flashing as an alternative to the claimed

6    evaporation step.

7                    Now, Genesis asserts that a stripper

8    can perform both step 1(a)'s limitations on its own.

9    It states that evaporation can happen in a stripper

10   alone via flashing, and it cites in its briefing

11   Column 5, lines 59 to 67.  But as I noted, flashing is

12   not an operation identified in the claim, and it is

13   never described as an alternative to the claimed

14   evaporation step.  To be clear, every embodiment shows

15   an evaporator following the stripping column, as the

16   described stripping is insufficient to carry out the

17   requisite evaporation.

18                    Now, Mr. Black --

19                    THE COURT:  Wait.  Let me ask you

20   about what you just said.

21                    MR. GINSBERG:  Sure.

22                    THE COURT:  You just said that the

23   stripping is insufficient to carry out the operation?

24   Where is the evidence of that?

25                    MR. GINSBERG:  The evidence of that is

1    if you look at the teachings of the specification as a

2    whole, Your Honor, whenever it talks about

3    concentrating, it talks about an evaporator, and it

4    never says you can have this evaporation in a

5    stripping column.  You need the evaporator for

6    evaporation.  Otherwise, you are not going to have the

7    requisite composition to carry out -- the

8    concentration to carry out the process.  That is

9    reading the specification as a whole.

10                THE COURT:  Let me ask you about the

11   flashing argument and going back to what you just

12   said.  So it is Column 5, lines 59 through 67.  It

13   talks about "the aqueous brine, if at elevated

14   temperatures, may be flashed to evaporate water and to

15   release gases including carbon dioxide as stream 111."

16   And then I get your point about how this is a

17   different embodiment than what is claimed.  I am not

18   that worried about it in light of the other portion of

19   of the spec that says that at least with respect to up

20   through the neutralization step, you can mix and match

21   Figures 1 and 2, the way I understood it.

22                And then you go to Figure 1, and you

23   see that stream 111 is a stream that is coming out of

24   the stripping column.  So I am looking at that and I

25   am thinking that you are evaporating water out of the

61

1    stripping column.  So why couldn't that be what this

2    element of the claim is talking about?

3                        MR. GINSBERG:  So did you say 111?

4    That's carbon dioxide.

5                        THE COURT:  Well, no.  It says, ". . .

6    may be flashed to evaporate water and to release gases

7    including $CO_2$ as stream 111."  So that could be

8    evaporating water and carbon dioxide; right?

9                        MR. GINSBERG:  I see your point, Your

10   Honor.  But again, flashing is low pressure.

11   Stripping uses steam to strip carbon dioxide.  By

12   contrast, flashing uses low pressure.  It is not

13   providing the requisite evaporation, because that's

14   why the specification follows that you are going to

15   have an evaporator.  You are going to follow it with

16   an evaporation step in an evaporator.

17                        THE COURT:  I understand your

18   position.

19                        MR. GINSBERG:  Thank you.  Just so you

20   can have the requisite concentration to proceed with

21   the process.  You need that evaporator.

22                        THE COURT:  Well, as a matter of

23   science I can't disagree with you because I don't

24   know.  But I don't have extrinsic evidence before me.

25   I am trying to look at this and make sense of it just

1    based on the intrinsic evidence, so that's the

2    challenge that I am having.  I am trying to figure out

3    why they are necessarily wrong without having expert

4    testimony telling me that just as a matter of science

5    they are wrong.

6              MR. GINSBERG:  The response to that,

7    Your Honor, is if you read the specification as a

8    whole, evaporation is discussed as occurring in an

9    evaporator.  In each of the claimed embodiments, the

10   Figure 1 embodiment, the Figure 2 embodiment, an

11   evaporator is required to concentrate.  Otherwise,

12   those figures wouldn't include an evaporator.

13             THE COURT:  All right.  Please

14   proceed.

15             MR. GINSBERG:  If you go to Slide 78,

16   Genesis' construction turns "evaporation-stripping"

17   into "evaporation and/or stripping," and as I stated

18   at the outset, that construction fails to give meaning

19   to all of the claim terms.  The '497 patent, it does

20   not disclose a process without an evaporation step,

21   without it being performed in an evaporator.

22             Next slide.  Genesis is seeking to

23   change the claimed process from one that is disclosed

24   to one that is not, and that cannot be adopted.

25   That's an improper construction.  It flies in the face

1    of the intrinsic record and should be rejected, and

2    Ciner's construction should be adopted.

3                    Unless Your Honor has any further

4    questions, that's all I have on this term right now.

5                    THE COURT:  No more questions on that

6    term.

7                    MR. GINSBERG:  Thank you, Your Honor.

8                    MR. BLACK:  Your Honor, can I respond?

9                    THE COURT:  We have got some time.  If

10   you want to use your time for it, that's fine.  We

11   will let Mr. Ginsberg have another word if he has

12   something to say.

13                   MR. BLACK:  Okay, sure.  Very quickly,

14   Your Honor.

15                   The submission made by counsel is that

16   you should look at the specification as a whole, that

17   there are no examples of using a stripper without an

18   evaporator or not using a stripper and using an

19   evaporator, and that's just not right.  There are two

20   full-blown embodiments shown in the figures, but there

21   are many options discussed in the specification.

22                   Here on Slide 25, at Column 6, line 22

23   to 35, it says a stripping device is optional,

24   although it is preferred.  And then the last sentence

25   refers to a combined concentrator-stripper.  Your

1    Honor also pointed out that flashing clearly leads to

2    evaporation, and it is plain that the evaporation and

3    stripping can be done in the same unit.

4              But the issue here is really a claim

5    construction issue, and some of the science issues

6    will have to wait for the infringement part of the

7    case.  And we have -- the only place where evaporation

8    and stripping are anywhere close to the form in which

9    they are in in the claim is in the summary of the

10   invention, where it says "evaporation and/or

11   stripping" and then describes how that can perform the

12   precise functions almost word for word as what is

13   described in the claim element.

14             So that we believe is the proper

15   construction given the specification, and we object to

16   any construction which requires a specific process

17   unit or two process units or that requires a separate

18   evaporator for evaporation if, if, the other elements

19   in the claim can be met solely in a stripper or

20   something that the experts call a stripper rather than

21   an evaporator.

22             THE COURT:  Thank you.  Go ahead,

23   Mr. Ginsberg.

24             MR. GINSBERG:  Your Honor, just

25   briefly, the patent never identifies flashing as an

1    alternative to stripping, and what was claimed

2    specifically requires evaporation and stripping.

3    Genesis is seeking to convert that into evaporation

4    and/or stripping.  Mr. Black conceded that at the

5    beginning.  That can't be a construction that gets

6    adopted.  And as set forth in every embodiment, when

7    they are talking going through the claimed

8    embodiments, the process requires that the slurry --

9    that the feed brine gets converted in a stripping step

10   and concentrated in an evaporator.

11              THE COURT:  Thank you, counsel.  Let's

12   move on to the last set of terms.

13              MR. BLACK:  I am going to turn over

14   the command to Mr. Gribbin.

15              MR. GRIBBIN:  Good afternoon, Your

16   Honor.  This is Joe Gribbin.

17              THE COURT:  Good afternoon.

18              MR. GRIBBIN:  Let me share my screen,

19   bring up the slides.  Okay.  Can everyone see that?

20              THE COURT:  Yes.

21              MR. GRIBBIN:  Okay.  All right.  So

22   the last two terms, we have combined them because they

23   are really the same issue:  The concentrated brine and

24   the crystallizable solution.

25              So the first one, the concentrated

1    brine, Genesis Alkali proposes the plain and ordinary

2    meaning.  If there is a construction necessary beyond

3    the plain and ordinary meaning, we would say it is the

4    concentrated brine produced in step 1(a).  Ciner's

5    proposed construction is all of the concentrated

6    brine, so they are limiting it to the entire stream of

7    concentrated brine.

8              As you can see here, the issue is the

9    same for the crystallizable solution.  Again, Genesis

10   Alkali proposes the plain and ordinary meaning, and

11   Ciner again proposes that it would be all of the

12   crystallizable solution produced in step 1(b).

13             I just want to go back to the language

14   of the claim.  If you look where these terms appear in

15   element (b) and element (c), there is nothing in the

16   claim language that limits the concentrated brine or

17   the crystallizable solution to all of those streams.

18   And I think, as everyone here is aware, claims will

19   not be read restrictively unless the patentee has

20   demonstrated a clear intention to limit the claim

21   scope using words or expressions of manifest exclusion

22   or restriction.  Again, there are no words of manifest

23   exclusion or restriction limiting these two terms to

24   all of the concentrated brine or all of the

25   crystallizable solution.  They are just not there.

1                        And if you go to the specification --

2      we are at Slide 30 now -- the specification actually

3      allows for portions of streams to be diverted to other

4      processes.  In particular, on Slide 30 we see the

5      concentrated brine itself shown in stream 122.  At

6      Column 7, lines 55 to 59, it says very clearly you can

7      take a portion of the concentrated brine stream 122

8      and use it to produce caustic soda.  If you are taking

9      a portion of this stream to make caustic soda, that is

10     not all of the concentrated brine going to the

11     neutralization step.  However, the claim language

12     doesn't restrict it to all of the concentrated brine

13     in that way.

14                        And it is not just the concentrated

15     brine that the specification allows for portions to be

16     diverted to other processes.  You can see in other

17     parts of the specification the same happens to the

18     stripped brine, and you see it on the left-hand side

19     of this slide, stream 114.  The specification at

20     Column 6, lines 37 to 43 say very clearly the stripped

21     brine can be sent to other processes.  It can be

22     purged.  You can see that at the bottom of the slide

23     there, Column 4, lines 50 to 53.

24                        The specification also allows to

25     divert the feed brine to make caustic.  That's at

1    Column 7, lines 50 to 55.

2                    All of this goes to say that since the

3    patent -- since the specification allows all of these

4    streams to be diverted to other processes, it does not

5    necessarily mean that when the claim says a

6    concentrated brine or when the claim says a

7    crystallizable solution, that is limited to all of

8    those streams.  It could be a portion.  It could be

9    all of.

10                   Okay.  And with that, I will hand it

11   over, and I will have some words in response, I am

12   sure.

13                   THE COURT:  Counsel, proceed.

14                   MR. GINSBERG:  Thank you, Your Honor.

15   If we can pull up our presentation, starting with

16   Slide 83.  And so we have here both sides' positions.

17   Ciner's proposed construction for the concentrated

18   brine and crystallizable solution is, in fact, all of

19   each of those streams produced in step 1(a) and 1(b)

20   respectively.

21                   Now, turning to Slide 85, while

22   Genesis says that it is seeking to apply plain and

23   ordinary meaning, it is actually trying to broaden the

24   claim by reading in "at least a portion of" to the

25   claim term.  So this is not about disavowal, so

1   Mr. Gribbin talking about the legal standard for

2   disavowal, that is really not applicable here.  This

3   is an issue of claim construction.  And in a nutshell,

4   the dispute here concerns whether the claims should be

5   construed to cover a splitting of the concentrated

6   brine stream after step 1(e) and a splitting of the

7   crystallizable solution stream after step 1(b).  Such

8   an interpretation is neither supported by the claim

9   language nor the specification.

10               Next slide.  Step (a), as recited in

11  the claims, forms a concentrated brine, and that

12  concentrated brine proceeds to step (e).  The claim

13  does not recite a portion of the concentrated brine

14  formed in step (a) flowing to step (e).

15               The neutralizing step (b) then forms a

16  crystallizable solution, and that solution proceeds to

17  step (c).  Again, the claim does not recite a portion

18  of the crystallizable solution formed in step (b)

19  flowing to step (c).

20               Next slide.  We have a cite from the

21  Cobalt case, which we believe to be analogous to our

22  situation.  In Cobalt the plaintiff sought to

23  interpret "180 degrees" as "about 180 degrees."  And

24  in rejecting the plaintiff's position, the Federal

25  Circuit said that the claim recited "180 degrees," not

| | |
|---|---|
| 1 | "about 180 degrees."  Similarly, Your Honor, in our |
| 2 | situation, the claim does not contemplate only a |
| 3 | portion of the concentrated brine formed in step 1(a) |
| 4 | flowing to step 1(b), nor does it contemplate only a |
| 5 | portion of the crystallizable solution in step 1(b) |
| 6 | flowing to step 1(c).  The broadening language "at |
| 7 | least a portion of" was not used to modify either of |
| 8 | these two terms. |
| 9 | Now, next slide.  In fact, when the |
| 10 | claims contemplated less than 100 percent of the |
| 11 | solution being acted upon, it uses the "portion of" |
| 12 | language.  Step 1(a) recites converting "at least a |
| 13 | portion of" the sodium bicarbonate in the mine brine |
| 14 | to sodium carbonate to form a concentrated brine. |
| 15 | Step 1(b) recites neutralizing "at least a portion of" |
| 16 | the remaining sodium bicarbonate in the concentrated |
| 17 | brine to form a crystallizable solution.  Step 1(e) |
| 18 | and Claims 3 and 5 also include the "a portion of" |
| 19 | language to modify other terms.  The concentrated |
| 20 | brine and the crystallizable solution are not modified |
| 21 | by the "a portion of" language. |
| 22 | Now, next slide.  Genesis' |
| 23 | construction would raise the phrase "a portion of" |
| 24 | used to modify the other terms meaningless, and such a |
| 25 | construction is contrary to the law.  Certainly, it is |

1    well settled a claim construction that gives meaning

2    to all the terms of the claim is preferred over one

3    that is not, and that is from the Akzo Nobel case that

4    we cited in our briefing that was quoting the Merck

5    case, two Federal Circuit cases.  A construction of

6    rendering claim language as "mere surplusage" is

7    "generally to be avoided."  That is the Trusted Knight

8    case from this court.

9              THE COURT:  Let me ask you something.

10   I am not sure I can articulate this quite right, but

11   hopefully you will get the gist of what I am asking.

12             There is another principle in patent

13   law, which is that when you have a comprising claim,

14   that the claim captures a process if the steps of the

15   claim are performed, even if there are additional and

16   other steps going on.

17             So I understand your point about that

18   you need to look to this other language that says "at

19   least a portion of," and it may be that is how you

20   read whether all of the process outputs from (a) and

21   (b) go to (b) and (c).  But it almost seems like your

22   construction is having the result that this would

23   really be a consisting essentially of claim, that you

24   can't be doing other things in addition to what is

25   going on in these steps.

1            Does that question make sense?  And it

2     is okay for you to say no, because I can try to

3     rearticulate it.  And if so, do you have a comment on

4     what I am saying?

5            MR. GINSBERG:  It does make sense,

6     Your Honor.  I understand your point.  And, you know,

7     so first we have the issue which I just went over:

8     That when the applicant meant to use that broadening

9     language "at least a portion of," he used that

10     language.  And if Genesis' construction were to be

11     adopted, then that renders that language completely

12     meaningless, and that is one reason why the

13     construction should not be adopted.

14            The second reason also is that you

15     have to look when construing a claim, of course, you

16     look at the intrinsic record and you see what is

17     taught.  There is no portioning of those streams.

18     There is no portioning or splitting of the stream of

19     the formed concentrated brine as it is passed to the

20     neutralization step, and there is no teaching of any

21     portioning or splitting of the stream of the

22     crystallizable solution as it moves to the

23     neutralization step to the monohydrate crystallization

24     step.

25            What Mr. Gribbin referred to, he was

1    talking about like a purging of a stream downstream of

2    those steps.  But if you look at the teachings, what

3    is disclosed is when you have the stream coming off

4    the evaporator, the stripping and evaporating step,

5    all that solution is passed on to the neutralizing

6    step.  There is absolutely no teaching of that

7    concentrated brine being portioned off.  So Genesis'

8    construction is based on what is taught by the

9    specification, and it also is informed by the claim

10   language.

11              When the applicant wanted to use the

12   broadening language, he chose to use it.  And if

13   Genesis' construction is adopted, then it is just

14   rendering those terms meaningless.

15              THE COURT:  So it is interesting.  So

16   you made the point about looking at the specification,

17   and one thought that I had was one view of the

18   specification is, you know, that one of the claimed

19   improvements here that's specific to Figure 2 is that

20   instead of taking the first mother liquor stream and

21   either sending it back to the mono feed prep or

22   purging it, which is shown in Figure 1, that what step

23   (e) is really talking about is taking some of that

24   mother liquor and feeding it to the deca

25   crystallization step.  And so you are not talking

1    about feeding all of it, just some of it, and feeding

2    some of it is what is new.

3                    And so I wonder whether the spec cuts

4    against you because maybe what they are really talking

5    about here is yes, our improvement that we are

6    claiming here in Claim 1 is doing something with at

7    least some of that first mother liquor, whereas before

8    we would have just recycled it back to the mono

9    crystallizer or purging it.

10                   MR. GINSBERG:  I understand your

11   point, Your Honor.  I don't think that's what the

12   specification teaches, though.  It is clear that when

13   that portion of language is used, it is a broadening

14   of the claim.  But when you are referring to the

15   concentrated brine and the crystallizable solution,

16   that language is not used.  So it could have said, you

17   know, all of that, you know, all of the solution.  It

18   could have left out a portion of that solution going

19   to the decahydrate crystallizer, but they chose to add

20   the broader language for that step.  And the patent

21   doesn't -- and that's a reading of the specification,

22   and that's why you have the issue that you do.

23                   You have the teaching of the

24   specification and then you have the claim language.

25   Where the applicant chose to use the broader language,

1    he did.  And there would have been no need to do that

2    if "a portion of," if "at least a portion of" wasn't

3    broadening the claim, because then you would still

4    have the point of the invention.  You would be passing

5    the mother liquor to the decahydrate crystallizer

6    before having it flow back to the monohydrate

7    crystallization step, which is the invention, or the

8    alleged invention.

9                     THE COURT:  I don't have any further

10   questions.  You can continue if there is more you want

11   to say.

12                    MR. GINSBERG:  I think I was just

13   making this point, Your Honor -- if you go to Slide

14   90 -- that Ciner's position is fully supported by the

15   specification.  If you look at Figure 2, all of the

16   concentrated brine leaving evaporator 220 is routed to

17   neutralizer 230 as stream 222, and all of the

18   crystallizable solution that is leaving the

19   neutralizer 230 is routed to the monohydrate feed prep

20   240 as stream 232.  There is no portioning of the

21   concentrated brine stream or the crystallizable

22   solution stream that is disclosed.

23                    And we continue on in our

24   presentation.  We have some passages from the

25   specification that confirms that it does not

1    contemplate portioning these streams.  There is a

2    passage that confirms that all of the crystallizable

3    solution from step 1(b) is fed to a monohydrate

4    crystallization step, 1(c).

5                   And to be clear, Your Honor, in Slide

6    92, where the claims recite only a portion of a stream

7    being acted upon, there is support in the

8    specification.  As Your Honor pointed out, in step

9    1(e), that recites feeding at least a portion of the

10   first mother liquor to a decahydrate crystallization

11   step, and as Figure 2 shows, there is support for

12   that.  But there is no support for feeding just a

13   portion of the concentrated mine brine to the

14   neutralizing step or just a portion of the

15   crystallizable solution to the monohydrate

16   crystallization step.

17                  And, in fact, on Genesis' Slide 30 and

18   in its briefing, when they cite to Column 7, lines 55

19   to 59, that actually supports Ciner's construction,

20   not Genesis', because unlike Claim 1, the cited

21   passage uses the broader language "a portion of."

22   Now, so what do they do?  They again resort to

23   doctoring a figure.  Here they are doctoring Figure 1

24   by saying that you can have a portion of the stream

25   come off here.  That annotation that they put in, that

1    dotted line coming after the stripping-evaporation

2    step to the neutralizing step, that is just not

3    disclosed.

4                    Genesis does not and cannot cite any

5    passage in the specification where the '497 patent

6    contemplates splitting -- we will first start with the

7    crystallizable solution feed stream that is fed to the

8    monohydrate crystallization step, and the claims are

9    not directed to using only a portion of the

10   concentrated brine to arrive at the claimed invention,

11   which is purportedly to optimize the recovery of

12   sodium bicarbonate monohydrate.

13                   So for those reasons, Your Honor,

14   Ciner maintains that the concentrated brine should be

15   construed as all of the concentrated brine produced in

16   step 1(a) and that the crystallizable solution should

17   be construed as all of the crystallizable solution

18   produced in step 1(b).

19                   And unless Your Honor has any further

20   questions, I will pass it back to Genesis' counsel.

21                   THE COURT:  No further questions.

22                   MR. GRIBBIN:  If I may respond.

23                   THE COURT:  Please proceed.

24                   MR. GRIBBIN:  We heard Mr. Ginsberg

25   speak a lot about "a portion of," "at least a portion

1    of" being absent from the claim terms "concentrated

2    brine" and "crystallizable solution."  What Ciner's

3    argument comes down to here is this idea that the

4    absence of broadening language in a claim term limits

5    that claim term.  That's not what the law is, but that

6    is what their argument is.

7                    You can have the absence of narrowing

8    language can be used to broaden a claim term.  That's

9    what this Enzo case, that's what the Core Wireless

10   case that Ciner cites stands for.  But you can't do it

11   backwards.  This is what Ciner is trying to do here.

12   They are trying to say the absence of "a portion of"

13   somehow limits these terms.  That's just not how claim

14   construction should work here.

15                    I don't see any case law that supports

16   this kind of -- this backwards idea that the absence

17   of broadening language can be used to limit a claim.

18   The closest I can see in their slides and also in

19   their surreply is this Cobalt Boats case.  Let me just

20   share my screen and bring it up for a minute.  All

21   right.  Can you see that?

22                    THE COURT:  Yes.

23                    MR. GRIBBIN:  So if you look at the

24   title of this slide, this is the point I mentioned a

25   minute ago; that they are arguing the lack of

1    broadening language indicates a narrower scope, and

2    they cite to this line.  "Cobalt confirmed that it is

3    essentially requesting a construction of the term '180

4    degrees' to mean 'about 180 degrees.'  But the claim

5    says '180 degrees,' not 'about 180 degrees.'"

6              When you read the case and you look at

7    the next line of this opinion, which I will bring

8    up -- let me share my screen again.  Okay.  So this

9    line in blue here is what we saw in Ciner's slide:

10   "Cobalt confirmed that it is essentially requesting."

11   The next sentence makes it clear what we are talking

12   about here.  What this case is talking about is

13   precise numerical boundaries, like 180 degrees.

14   "Where a precise value is included in the claim

15   without a term such as 'about,' we interpret the claim

16   language as imposing a strict numerical boundary."

17             What the issue is here is not strict

18   numerical boundaries.  This is the absence of the "at

19   least a portion of" that they are saying the absence

20   of limits these terms to all of the streams.  Cobalt

21   Boats does not support that argument whatsoever.

22             Also, and, Your Honor to this point,

23   the way this claim is set up, it is almost like a

24   comprising claim.  It could include other steps going

25   on with these process streams if they get diverted to

1    other processes.  I mentioned in my opening part of

2    this term some of the examples of how these streams

3    get processed or portioned off and sent to other

4    processes like making caustic.

5              Also, Ciner's claim construction would

6    make no sense.  What if there is a leak in the line;

7    right?  What if you are taking a sample from the line?

8    Is that all of?  What if there is an overflow?  What

9    if there is a downstream process unit that can't take

10   all of the flow, so you need to divert it to something

11   else?  That, under Ciner's construction, would fall

12   outside the scope of this claim, and that cannot be

13   correct.  That's not how it should work.

14             Mr. Ginsberg said a few times that

15   there is no teaching that the stream 122, the

16   concentrated brine, could be diverted to other

17   processes.  I thought it was pretty clear there is a

18   portion of the specification that says you can do

19   exactly that.  Column 7, lines 55 through 59 say you

20   can take a portion of the stream 122 and send it to

21   make caustic.  So I think that point he made is

22   incorrect.

23             And those are the points I have in

24   response.

25             THE COURT:  You might as well continue

1    how we have been going, Mr. Ginsberg.  Anything you

2    want to say in response to that?  And then we will go

3    to Mr. Gribbin to have the last word.

4                    MR. GINSBERG:  Sure, Your Honor.

5    Thank you.

6                    So Mr. Gribbin cited to Column 7,

7    lines 55 to 59 again.  However, I think I mentioned

8    that that portion actually supports Ciner's

9    construction, not Genesis'.  That passage recites that

10   caustic soda may be prepared, you know, by the lime

11   causticization of a portion of the feed brine.  A

12   portion of the concentrated solution could also be

13   used.  So that is talking about causticization, not

14   the claimed optimization of the sodium carbonate

15   monohydrate crystals.  And in any event, the claims

16   are not directed to this causticization.

17                   The Cobalt case we do think is on

18   point.  The cases that we also cited in support are

19   the Akzo Nobel case, the Merck case, the Trusted

20   Knight case, where Genesis' construction is rendering

21   the later use of the "a portion of language," the "at

22   least a portion of" language to be surplusage and

23   ineffectual.  When the applicant chose to construe the

24   claim to have an element and modify an element without

25   broader language to reflect that only a portion may be

1   passed on to a particular next step, he used that "at

2   least a portion of" language.  So it could be at least

3   a portion of or it could be all of.  He did not use

4   that when modifying the concentrated brine and

5   crystallizable solution terms.

6                    So I think with that, Your Honor,

7   that's all I have for this term --

8                    THE COURT:  Okay.

9                    MR. GINSBERG:  -- for these terms.

10                   MR. GRIBBIN:  And, Your Honor, I do

11  have a response.  Mr. Ginsberg makes this distinction

12  between causticization and the claim process.  We are

13  not talking about causticization here.  What we are

14  talking about is diverting a stream to another

15  process.  That process still -- or that process

16  stream, a portion of it is still continuing on through

17  the claimed process.  Causticization, whatever the

18  other process is, is of no moment here.

19                   And secondly, we talk about Enzo so,

20  we talk about Cobalt Boats.  There is no case in their

21  briefing and no case I am aware of that stands for

22  this kind of backwards proposition that they base

23  their whole argument of this section on, that the

24  absence of broadening language somehow limits the

25  claim.  There is just no law that they can provide

83

1    that stands for that point.  That's the basis of their

2    argument.  Without law, it fails.

3                    THE COURT:  Thank you, counsel.

4                    I think I understand everyone's

5    position on all of the disputed terms.  Hopefully,

6    everybody had a chance to say everything they wanted

7    to say.  We gave you multiple chances for replies and

8    surreplies.

9                    Here is what I intend to do.  I intend

10   to take a recess and consult my notes from the

11   comments that were made today as well as the arguments

12   made in the briefs.  I think I am going to be in a

13   position to rule on all of the disputed claim terms

14   today.  So it is 2:49 now.  Let's say at 4:00 p.m. we

15   will come back on the record and I will read you my

16   report and recommendation on construction of the

17   disputed claim terms.  If for whatever reason I am

18   running a little bit late, I will let my courtroom

19   deputy know so she can advise everyone.  But if you

20   could all be on Zoom again at 3:50, which is ten

21   minutes before 4:00 p.m., my courtroom deputy will

22   come on and confirm that everyone is there, and then

23   we can proceed at 4:00.

24                    I am not sure who is hosting this Zoom

25   link, but could they confirm for the record that that

1    is something that is technologically possible.

2                      MR. STEIN:  This is Josh Stein, at

3    Patterson Belknap.  That is fine, Your Honor.

4                      THE COURT:  It is not possible or it

5    is possible?

6                      MR. STEIN:  It is possible, yes.

7    Sorry.

8                      THE COURT:  Very good.  Not a problem.

9    It is not a problem, so that's what we will do.

10                     Anyone else have anything they want to

11   say before we take a recess, or a question?

12                     MR. BLACK:  No, thank you, Your Honor.

13                     MR. GINSBERG:  Thank you, Your Honor.

14                     THE COURT:  Thank you, all of you.  We

15   will be in recess, and we will come back on to hear

16   the ruling at 4:00 p.m.

17                     MR. BLACK:  Thank you, Your Honor.

18                     MR. GINSBERG:  Thank you, Your Honor.

19        (Recess taken from 2:51 p.m. to 4:06 p.m.)

20                     THE COURT:  Good afternoon, everyone.

21   This is Jennifer Hall.  Thank you for your patience.

22   Can you hear me? I see everyone is nodding yes.  It is

23   my worst nightmare that I read the whole thing on

24   mute, which has happened to someone I know.  So I will

25   ask my courtroom deputy to let me know if I cut out at

1    any point, and then I will pop back in and restart

2    where I cut out.

3                    I have consulted my notes from the

4    argument as well as the briefing, and I am prepared to

5    issue a ruling on all of the disputes argued today.  I

6    will not be issuing a separate written report and

7    recommendation, but I will issue a document that

8    incorporates the transcript from my oral ruling today.

9                    I want to emphasize before I announce

10   my decisions that while I am not issuing a separate

11   written opinion, we have followed a full and thorough

12   process before making the decisions I am about to

13   state.  We have carefully reviewed the patent-in-suit.

14   There was also a full briefing on each of the disputed

15   terms.  The parties submitted their briefing in

16   accordance with Judge Stark's procedures, which are

17   consistent with my procedures.  Each side had the

18   opportunity to submit two briefs, and they were

19   combined into one joint claim construction brief

20   incorporating all arguments; that is, arguments from

21   plaintiff's opening brief, defendants' answering

22   brief, plaintiff's reply, and defendants' surreply.

23                   The parties' joint claim construction

24   brief and chart also attached several exhibits.  Those

25   exhibits included portions of the prosecution

1    histories relied on by the parties as well as certain

2    extrinsic evidence.  Neither party elected to put on

3    live expert testimony or submit any declarations, but

4    the Court permitted lengthy oral argument here today.

5    All of that has been carefully considered.

6              And to be clear, while my oral ruling

7    will cite to the intrinsic and extrinsic evidence that

8    I conclude best support my recommended constructions,

9    my failure to cite to other evidence provided by the

10   parties does not mean that I ignored or failed to

11   consider it.  As I have stated, I have considered all

12   of the arguments and evidence cited by the parties.

13             Now as to my rulings.  As an initial

14   matter, I am not going to read into the record my

15   understanding of the general legal principles of claim

16   construction.  I set forth the legal standards in my

17   opinion in 3Shape vs. Align.  That's at 2020 Westlaw

18   2188857, and I incorporate that articulation by

19   reference.  That opinion also sets forth the legal

20   standard governing indefiniteness.  I also incorporate

21   that recitation by reference.

22             Of course, a claim term is supposed to

23   be given the meaning that the term would have to a

24   person of ordinary skill in the art in question at the

25   time of the invention.  And I note here that neither

1    side has argued that any difference the parties may

2    have in defining one of ordinary skill in the art

3    impacts how I should resolve the disputes before me

4    today.

5              All of the disputed terms are found in

6    Claim 1 of U.S. Patent No. 6,589,497, entitled

7    "Process for Preparing Soda Ash from Solution Mined

8    Bicarbonate Brines."  Claim 1 is generally directed to

9    a particular process to recover sodium carbonate

10   monohydrate from a mine brine obtained by dissolution

11   of an underground ore body.  The claimed process has a

12   number of required steps, which are set forth in claim

13   phrases 1(a) through 1(g).

14             The parties have agreed on the

15   construction of a number of terms, and I recommend to

16   Judge Stark that he adopt those agreed-upon

17   constructions.

18             The first dispute between the parties

19   has to do with whether the steps set forth in elements

20   1(a) through 1(g) must occur "sequentially."  Genesis

21   asks for a construction that steps 1(a) to 1(g) do not

22   need to be performed sequentially.  Ciner asks for a

23   construction that "steps 1(a) to 1(g) must be

24   performed sequentially."

25             The essence of the dispute can be

| | |
|---|---|
| 1 | summed up as follows:  Genesis acknowledges that steps |
| 2 | 1(a) through 1(c) and 1(e) through 1(g) must occur |
| 3 | sequentially.  For example, step 1(b) uses the output |
| 4 | of step 1(a), and step 1(c) uses the output of step |
| 5 | 1(b).  But Genesis argues that steps 1(c) through 1(e) |
| 6 | do not require order because the first mother liquor |
| 7 | from step 1(c) may be fed directly to the sodium |
| 8 | carbonate decahydrate crystallizer of step 1(e) |
| 9 | without undergoing the separation of step 1(d). |
| 10 | To be clear, Genesis acknowledges that |
| 11 | under the law step 1(d) must be performed to infringe |
| 12 | the claimed process, but Genesis' point is that the |
| 13 | input to step 1(e) does not need to come from step |
| 14 | 1(d).  Rather, the input to step 1(e) can come from |
| 15 | step 1(c). |
| 16 | Ciner says that the input to step 1(e) |
| 17 | comes from step 1(d), and thus, step 1(d) and 1(e) |
| 18 | must be performed sequentially. |
| 19 | As an initial matter, in making this |
| 20 | ruling I am cognizant of Genesis' point that the |
| 21 | claimed process occurs in a continuous loop and that |
| 22 | the claimed steps can be performed simultaneously.  I |
| 23 | am fully aware of that concept, the concept that is |
| 24 | illustrated, for example, in Figure 2, which is a |
| 25 | simplified version of a process flow diagram.  The |

1    question I am being asked to answer and the question I

2    am answering is the sequence of steps in the process

3    flow.

4                    In Interactive Gift and Altiris the

5    Federal Circuit set out a two-part test for

6    determining if the steps of the method claim that do

7    not otherwise recite an order must nonetheless be

8    performed in the order in which they are written.  The

9    Federal Circuit instructs me to first look at the

10   claim language to determine if, as a matter of grammar

11   or logic, they must be performed in the order written.

12   If the logic and grammar of the claim language do not

13   require an order, then I turn to step 2, and I look to

14   the rest of the specification to determine whether it

15   "directly or implicitly requires such a narrow

16   construction."  If not, the sequence in which such

17   steps are written is not a requirement.

18                    In my view, the language of the claims

19   resolves this dispute at step 1 of the Altiris test.

20   The output of step 1(c) is a slurry.  That step goes

21   on to say what the slurry is comprised of; namely, a

22   mixture of sodium carbonate monohydrate crystals and a

23   first mother liquor, but the result of the step is a

24   slurry.  Step (d) starts with that slurry and it

25   "separates the sodium carbonate monohydrate crystals

1    from the first mother liquor to form a first mother

2    liquor."  To repeat, the claim language says that a

3    first mother liquor is formed in step 1(d).  Step (e)

4    says that a portion of the first mother liquor gets

5    fed into the sodium carbonate decahydrate

6    crystallization step.  Since the claim itself says

7    that the first mother liquor is formed in step 1(d), I

8    agree with Ciner that the input to step (e) comes from

9    step (d).

10                   I recognize, of course, that the

11   mother liquor and the mono crystals are created as a

12   result of a chemical reaction that takes place in step

13   (c), but the result of that reaction is a slurry that

14   has more than one component:  The mono crystals and

15   the mother liquor.  Those components are physically

16   separated in step (d) resulting in what the claim

17   refers to as "the formation" of the first mother

18   liquor"; i.e., mother liquor that is separated from

19   the mono crystals.  And I conclude that it is the

20   separated mother liquor from step 1(d) that is

21   referred to in step 1(e).

22                   While this dispute can be resolved

23   solely with reference to the claim language, I also

24   note that my conclusion is consistent with the

25   specification, which describes the creation of a

1    slurry in the monohydrate crystallizer that contains

2    mono crystals and a first mother liquor.  The crystals

3    are then physically separated from the first mother

4    liquor.  The first mother liquor "separated from the

5    slurry" may be fed to a decahydrate crystallizer.

6    See, for example, Column 9, lines 18 through 28 and 42

7    to 58, and Column 13, lines 24 to 32.

8                    Genesis points to a sentence in the

9    specification that discloses recovering the first

10   mother liquor directly from the sodium carbonate

11   monohydrate crystallizer, Column 9, line 64 to Column

12   10, line 5.  The parties dispute whether that portion

13   of the specification refers to an embodiment that

14   informs the construction of Claim 1.  Either way, it

15   does not change the fact that the embodiment that is

16   claimed requires that the mother liquor is formed in

17   step 1(d).

18                   If Genesis has some infringement

19   argument under which recovering mono mother liquor

20   from the monohydrate crystallizer involves separating

21   the mother liquor from the crystals as described in

22   step 1(d) -- and its argument today in Footnote 3 of

23   the joint claim construction brief suggests that it

24   does -- my ruling today does not foreclose that

25   argument.  The argument hasn't been briefed by the

1    parties as a claim construction issue, and Ciner's

2    proposed construction doesn't necessarily foreclose

3    it.   No one has asked me to construe the separating

4    step of step 1(d).   My ruling today is only that the

5    mother liquor input into step 1(e) has to come from

6    step 1(d), and for that reason I adopt Ciner's

7    construction.

8                        Again, although I think this dispute

9    is resolved on the claim language, I note that my

10   construction is not inconsistent with the cited

11   portions of the prosecution history.   A previous

12   version of a claim referred to the input of step 1(e)

13   as a "substantially crystal-free mother liquor."

14   That's at Docket I.D. 51-3 at GENESIS-539.   The

15   "substantially crystal-free" language was rejected as

16   indefinite as to what the metes and bounds of this

17   language is, and that language was subsequently

18   removed from the claim.   While I give that portion of

19   the prosecution history no weight in reaching my

20   conclusion, I note that my conclusion is not

21   inconsistent with the applicant having an

22   understanding that the mother liquor obtained as a

23   result of separating it from the crystals in step 1(d)

24   was the mother liquor that would be fed into step

25   1(e).

1              With that, I will jump forward to the

2    last dispute in the briefs.  That dispute is over the

3    phrase "first mother liquor."  Ciner argues that the

4    phrase is indefinite.  Essentially, Ciner argues that

5    if I side with Genesis on the parties' order-of-steps

6    dispute, that means there are actually two first

7    mother liquors described in the claim:  One in step

8    1(c) and one in step 1(d), and because step 1(e)

9    refers to to the first mother liquor, a person of

10   skill in the art would be unable to tell which of the

11   two first mother liquors is being referenced.

12              At page 63, Footnote 11 of Ciner's

13   reply brief, it states that if the Court adopts its

14   construction on the order of steps, the first mother

15   liquor in step 1(e) would not be indefinite.  As I

16   have resolved the parties' order-of-steps dispute in

17   favor of Ciner, I do not need to reach this issue as

18   to element 1(e).

19              As to Claims 8 and 9, Ciner says in

20   the same footnote that the first mother liquor in

21   Claims 8 and 9 is indefinite under any construction.

22   But Ciner does not explain why that would be the case

23   for Claims 8 and 9 but not 1(e) except in a single

24   sentence on page 66 of the joint claim construction

25   brief that "under any construction, Claims 8 and 9 are

1    invalid as indefinite because they do not inform, with

2    reasonable certainty, to which of those first mother

3    liquors 'the first mother liquor' in Claims 8 and 9

4    refer."

5                    It is Ciner's burden to prove by clear

6    and convincing evidence that the disputed phrase is

7    indefinite in Claims 8 and 9.  On this record I find

8    that Ciner has failed to meet their burden to show

9    that Claims 8 and 9 are indefinite.  My ruling is

10   without prejudice for Ciner to renew its motion as to

11   Claims 8 and 9 at the summary judgment stage.

12                   I do have two more sets of terms.  I

13   am having a technological issue.  I am going to stop

14   my video and mute my microphone for just a minute and

15   I am going to see if I can get it straightened out.

16   So we will be in recess very briefly.  Please stay on

17   the line.

18                       (Recess taken.)

19                   THE COURT:  Thank you for your

20   patience.  We are back on the record.

21                   The next phrase is "evaporation-

22   stripping step."  There is a hyphen between the words

23   "evaporation" and "stripping."  Genesis construes the

24   phrase as "a step including evaporation and/or

25   stripping."  Ciner construes the phrase as "a step

1    including an evaporator and a stripper."  According to

2    Genesis, there are two disputes here:  One, does the

3    hyphen mean "and" or "and/or"; and two, does the claim

4    require evaporator and stripper apparatuses or just

5    the functions of evaporation and/or stripping.  After

6    reading the briefs and hearing the arguments today, I

7    agree with Genesis that it is an accurate

8    characterization of the dispute over this term.

9              First let's look at the claim itself.

10   Step 1(a) in its entirety requires "feeding the

11   recovered mine brine to an evaporation-stripping step

12   to concentrate sodium content in the mine brine and to

13   convert at least a portion of sodium bicarbonate

14   therein to sodium carbonate to form a concentrated

15   brine."  It is clear to me, and the parties do not

16   dispute, that step 1(a) requires two results:  One,

17   concentrating sodium content in the mine brine; and

18   two, converting at least a portion of sodium

19   bicarbonate to sodium carbonate.  It is not clear,

20   looking solely at the claim language, whether both of

21   those results can be achieved by evaporation alone or

22   stripping alone or whether they require an evaporator

23   apparatus and a stripping apparatus.

24             Genesis' interpretation that the

25   hyphen means "and/or" is not unreasonable.  Indeed,

1    the claim refers to step 1(a) as a single step.  On

2    the other hand, as Ciner points out, the patentee

3    could have said "and/or" if he meant "and/or."

4                Both sides make claim differentiation

5    arguments based on Claim 6, but reference to dependent

6    Claim 6 does not provide much help.  Claim 6 refers to

7    the process of Claim 1, wherein the evaporation-

8    stripping step comprises a first stripping step to

9    decompose sodium bicarbonate to carbon dioxide and

10   sodium carbonate followed by an evaporation step to

11   evaporate water to concentrate the sodium values in

12   the concentrated brine.  Genesis says Claim 6 supports

13   its interpretation that Claim 1 requires evaporating

14   and/or stripping because Claim 6 is further limiting

15   in that it requires both, while Ciner says Claim 6

16   supports its interpretation that Claim 1 requires both

17   evaporating and stripping because Claim 6 is further

18   limiting in that it specifies the order of operations.

19   As both are reasonable interpretations, I don't think

20   reference to Claim 6 provides much help.

21                Turning to the specification, Genesis

22   points to Column 2, lines 52 to 59, which states, "The

23   invention, more specifically, provides a process for

24   optimizing sodium carbonate monohydrate recovery from

25   a mine brine containing significant quantities of

1    sodium bicarbonate and minimal impurities by

2    evaporating and/or stripping such a mine brine to

3    concentrate sodium values in the mine brine and

4    convert at least a portion of the remaining sodium

5    bicarbonate therein to sodium carbonate to form a

6    concentrated brine."  That portion of the

7    specification contemplates that the term

8    "evaporation-stripping step" might refer to a step

9    that uses evaporation and/or stripping to accomplish

10   the claimed results.  Genesis also points to Column 6,

11   lines 23 to 36, where it states that a stripper is

12   optional, although generally preferred, or that a

13   combined concentrator-stripper may be utilized.

14              Those portions of the specification

15   suggest that the evaporation-stripping step should not

16   be construed to require both an evaporator apparatus

17   and a stripping apparatus, as argued by Ciner, and for

18   that reason, I reject Ciner's construction.

19              Although a closer call, I also side

20   with Genesis to the extent that Ciner is arguing that

21   the phrase requires both evaporating and stripping.

22   Genesis points to portions of the specification that

23   support its position that the processes of evaporation

24   and stripping are each independently capable of

25   accomplishing the claimed results, which are

1 concentrating sodium content in the mine brine -- see,

2 for example, Column 6, lines 55 through 60; Column 5,

3 line 59 through 67 -- and converting at least a

4 portion of sodium bicarbonate in the mine brine to

5 sodium carbonate. See, for example, Column 6, lines

6 55 through 57, Column 3, lines 60 through 66, and

7 Column 6, lines 1 through 14.

8 For example, Genesis points to Column

9 5, lines 59 through 67, which refers to a technique

10 called flashing which can result in the evaporation of

11 water, thus increasing the concentration of sodium

12 carbonate in the brine. Genesis argues that

13 evaporation can happen in a stripper alone via

14 flashing. The cited passage refers to the evaporation

15 of water and release of carbon dioxide gas as Stream

16 111, which in Figure 1 is shown coming out of the box

17 labeled "stripping column."

18 And I footnote that the specification

19 states that in comparing Figure 1 and Figure 2, it is

20 seen that Process 100 and Process 200 are identical

21 through the brine neutralization step. The numbering

22 of the steps and streams are equivalent in Figures 1

23 and 2.

24 Accordingly, I will construe

25 "evaporation-stripping step" as a step that includes

1    evaporation and/or stripping.

2                    That brings me to the last two terms:

3    The concentrated brine in step 1(b) and the

4    crystallizable solution in step 1(c).  Genesis

5    requests that I construe the concentrated brine in

6    step 1(b) to have its plain and ordinary meaning or,

7    if construction is necessary, to mean concentrated

8    brine produced in step 1(a).  Ciner requests that I

9    construe the phrase as all of the concentrated brine

10   produced in step 1(a).  Genesis requests that I

11   construe the crystallizable solution in step 1(c) to

12   have its plain and ordinary meaning or, if

13   construction is necessary, to mean crystallizable

14   solution produced in step 1(b).  Ciner requests that I

15   construe the phrase as all of the crystallizable

16   solution produced in step 1(b).

17                   The gist of the dispute is that under

18   Genesis' constructions, a portion of the outputs from

19   steps 1(a) and 1(b) can be diverted from the claimed

20   process and purged or used for other things.  Under

21   Ciner's constructions, all of the outputs from steps

22   1(a) and 1(b) go to steps 1(b) and 1(c) respectively.

23   In support of its argument, Ciner points out that in

24   step (e) only "at least a portion of" the first mother

25   liquor formed in step 1(d) is fed to the deca

1    crystallizer.  According to Ciner, the patentee's use

2    of the "at least a portion of" language in step 1(e)

3    and the absence of such language in steps 1(b) and

4    1(c) mean that the Court should construe the claims to

5    require that all of the outputs from steps 1(a) and

6    1(b) must be fed to steps 1(b) and 1(c) respectively.

7              Citing the Federal Circuit's Enzo

8    Biochem and Core Wireless decisions, Ciner argues that

9    the patentee knew how to craft language that would

10   permit diverting portions of streams as in the first

11   mother liquor fed into step (e) and that its choice

12   not to use that language implies an intent not to

13   permit the disputed concentrated brine and

14   crystallizable solution streams to be partially

15   diverted.

16             In response, Genesis argues that

17   Ciner's reliance on Enzo Biochem and Core Wireless is

18   misplaced because those cases dealt with the

19   patentee's use of narrowing language in other parts of

20   the claims and the patentee's choice not to use

21   narrowing language with respect to a disputed term

22   implied a broader construction of that term.  This

23   case is different, says Genesis, because Ciner wants a

24   narrow construction of the disputed terms.  It wants

25   to require that all of the outputs from steps 1(a) and

1    1(b) go to steps 1(b) and 1(c).  Genesis says that

2    Ciner's argument is backwards because Ciner

3    essentially is arguing that because the patentee knew

4    how to use a broader term, as in step 1(e), the Court

5    should adopt a narrower construction in steps 1(b) and

6    1(c).

7                    Genesis also points out that the

8    specification shows multiple examples of diverting

9    portions of streams.  Indeed, the specification states

10   that the disputed concentrated brine stream can be

11   partially diverted to other processes.  See, for

12   example, Column 7, lines 50 through 59.

13                   I side with Genesis.  Nothing in the

14   claim requires all of the outputs of step 1(a) and

15   1(b) to be fed to 1(b) and 1(c).  Moreover, the

16   portion of the specification I just cited is

17   consistent with Genesis' contention that the

18   concentrated brine stream can be used for other

19   processes.

20                   Ciner's argument that the "at least a

21   portion of" language in step (e) informs the disputed

22   constructions certainly has some appeal.  Where a

23   claim uses language to describe a given term but

24   doesn't use the same language in another term, the

25   choice may suggest an understanding of the patentee,

1    and that logic applies regardless of whether the

2    language used in other parts of the claim is

3    broadening or narrowing language.  But I don't think

4    it wins the day here for the reasons I already

5    discussed.  And while not dispositive, there are two

6    other reasons why I think Genesis' construction is

7    better.

8                    First, this is a process claim that

9    uses the word "comprising."  Ciner's proposed

10   constructions essentially seek to turn this claim into

11   a "consisting essentially of" claim.  Ciner is

12   basically arguing that even if it performs the claimed

13   steps of the process, it can escape infringement if it

14   performs other steps in addition to those steps.  That

15   is not the law.

16                   Second, read in view of the rest of

17   the specification, the "feeding at least a portion of

18   the first mother liquor" language in step 1(e) might

19   be understood to refer to what I see as one of the

20   improvements specific to Claim 1 and Figure 2; that

21   is, instead of taking the first mother liquor stream

22   and either sending it back to the mono feed prep or

23   purging it, as shown in Figure 1, step (e) requires

24   that at least some of the first mother liquor stream

25   be fed to the deca crystallization step, as described,

1    for example, in Column 9, lines 42 to 61 and shown in

2    Figure 2 as line 263.  The "at least a portion of"

3    language in step 1(e) is consistent with the

4    specification's description of a particular embodiment

5    where a portion of the mono mother liquor is diverted

6    to the deca crystallizer instead of put to the other

7    uses described in the specification.

8              When step 1(e) is read in light of the

9    specification, I can't conclude that its reference to

10   feeding at least a portion of the first mother liquor

11   outputted from step 1(d) would suggest to a person of

12   ordinary skill in the art that the entire output of

13   steps 1(a) and 1(b) must be fed to steps 1(b) and 1(c)

14   respectively.

15             Finally, just to complete the record,

16   I recognize that Claim 1 uses the "at least a portion

17   of" language in two other places, in step (a) and in

18   step (b), but I don't find that particularly

19   informative here.  Step 1(a) and 1(b) use that phrase

20   in the context of chemical yield.  I find that it

21   would not inform a person of skill in the art one way

22   or the other about the question in dispute here, which

23   is whether the outputs of steps (a) and (b) must all

24   be fed to steps (b) and (c).

25             And that concludes my report and

1    recommendation.

2                    I apologize for the technical issues

3    earlier.  Hopefully, I resolved all the disputes that

4    were at issue today.

5                    Anything further from counsel for

6    plaintiff?

7                    MR. BLACK:  Nothing, Your Honor.

8    Thank you very much.

9                    THE COURT:  Okay.  Anything further

10   from counsel for defendant?

11                   MR. GINSBERG:  No, Your Honor.  Thank

12   you.

13                   THE COURT:  All right.  Thanks to all

14   of you.

15                   MR. SILVERSTEIN:  Your Honor, Alan

16   Silverstein, for defendants.

17                   THE COURT:  Yes.

18                   MR. SILVERSTEIN:  For purposes of

19   objections, if either party should choose to do so,

20   what should we key that 14-day timing off of?

21                   THE COURT:  Thank you,

22   Mr. Silverstein.  So what I plan to do is this:  Once

23   I receive the transcript, we will review the

24   transcript to make sure that I said everything like I

25   wanted to say it, and we will issue it as a written

1    report and recommendation that we will put on the

2    docket.  We will run the 14 days from the date that

3    that appears on the docket.

4                     So you have got a little bit of extra

5    time to the extent you took good notes today.  It will

6    take us a day or two after we receive the transcript

7    to put it into a written report and recommendation

8    that we will put on the docket.  So we will put the

9    date on the docket, and the date will run from the day

10   we put it on the docket.

11                   MR. SILVERSTEIN:  Thank you, Your

12   Honor.

13                   THE COURT:  Yes.  Any other questions

14   from the parties?

15                   (There was no response.)

16                   THE COURT:  Well, thank you very much.

17   It is a pleasure to see you all in person over Zoom.

18   I hope everyone is staying safe and well, and we will

19   see you soon.  Take care.

20                   We will be adjourned.

21                   MR. GINSBERG:  Thank you, Your Honor.

22                   MR. BLACK:  Thank you, Your Honor.

23                        - - -

24             (Court adjourned at 4:39 p.m.)

25                        - - -

1                              <u>CERTIFICATE</u>

2                    I, LORRAINE B. MARINO, Registered

3      Diplomate Reporter, Certified Realtime Reporter and

4      Delaware Notary Public, do hereby certify that the

5      foregoing pages numbered 3 through 105 contain a true

6      and correct transcription of the proceedings as

7      stenographically reported by me at the hearing in the

8      above cause before the U.S. Magistrate of the District

9      of Delaware, on the date therein indicated.

10                   IN WITNESS WHEREOF I have hereunto set

11     my hand at Wilmington, this 6th day of October, 2020.

12

13

14                   _Lorraine B. Marino, RDR CRR_

15                   Registered Diplomate Reporter,
                     Certified Realtime Reporter
16                   and Delaware Notary Public

17

18

19

20

21

22

23

24

25

LORRAINE B. MARINO, RDR, CRR